569 A.2d 604

Jerry Wayne EANES

v.

STATE of Maryland.

No. 1, Sept. Term, 1989.

Court of Appeals of Maryland.

Feb. 8, 1990.

438

David A. French (The Rutherford Institute of Manassas, Virginia, Craig L. Silver, Campen & Silver, P.C., Gaithersburg), on brief, for petitioner.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued Before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL,* JJ.

ADKINS, Judge.

Section 121 of Article 27 (1987 Repl.Vol.) makes it unlawful for anyone to "wilfully disturb any neighborhood in [any Maryland] city, town or county by loud and unseemly noises...." In the case before us, we must decide whether this proscription is constitutional when used by the State to limit the volume level of speech protected by the first amendment to the United States Constitution.[1] Before addressing this issue, however, we set out the facts in some detail.

---

* Blackwell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. "Congress shall make no law ... abridging the freedom of speech...." This command is directed to state and local government by the fourteenth amendment. *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). As petitioner's contentions are based solely on the guarantee of freedom of speech under the first amendment, we do not deal with the similar guarantee under Article 40 of the Maryland Declaration of Rights. *See Sigma Delta Chi v. Speaker, Md. House of Delegates,* 270 Md. 1, 4, 310 A.2d 156, 158 (1973).

## I.

This case arises in the context of an anti-abortion demonstration which took place in front of the Hagerstown Reproductive Clinic (Clinic) on 18 May 1988. The Clinic is located on West Washington Street, a congested, one-way, two-lane thoroughfare in Hagerstown. The building which houses the Clinic also houses two other businesses and at least one residential apartment. Across the street from the Clinic is a residential apartment building.

On the morning of 18 May, petitioner Jerry Wayne Eanes (Eanes) was part of a small group that had gathered in front of the Clinic to, in Eanes's words, "assemble [,] to speak out against abortion, to pass out gospel tracts [and] to try and talk to girls that are walking by [in order to explain the evils of abortion]." Eanes's primary method of opposing abortion, however, was "to preach the gospel of Jesus Christ." Indeed, he asserted that his purpose was to preach to the entire neighborhood.[2]

Eanes and another man, Timothy Schuller, preached that morning between approximately 10:30 a.m. and 12:00 p.m. Each spoke for short periods of time at varying intervals. Each spoke unaided by any artificial amplification. People employed in the vicinity and local residents complained to the Hagerstown Police Department (Department) that they were being disturbed by the loudness of the preaching. At least one resident left her home and complained to the demonstrators. She requested that the noise level be reduced. The administrator of the Clinic left her office and complained directly to Eanes. She indicated to him that the noise was disrupting her work and requested that he quiet

---

**2.** Preaching on the public street was Eanes's only activity on West Washington Street on 18 May 1988. There is no suggestion that he made any effort to restrain physically anyone who attempted to enter the Clinic or that he tried to block access to the Clinic (*see* Ch. 807, Acts of 1989). Nor does the State contend that he threatened anyone with physical violence or that he trespassed on private property. Nor did he attempt to incite his listeners to violence, use profanity or obscenity, or hurl "fighting words" at his listeners.

down. Police Officer Feigly, who had responded to complaints received at the Department, also spoke with Eanes and with Schuller. He explained that a number of noise complaints had been received and requested that the volume level of the speech be reduced.

After warning Eanes, Officer Feigly left the scene, although it appears from the record that other police officers remained in the area. He returned approximately forty minutes later in response to further noise complaints received by the Department. At that time he observed Eanes shouting in a loud voice. He then placed Eanes under arrest for disturbing the peace in violation of § 121.

On 2 August 1988, the District Court of Maryland sitting in Washington County (Glaser, J.) found Eanes guilty of disturbing the peace in violation of § 121. On 15 December 1988, Eanes obtained de novo review of his conviction before Judge Frederick C. Wright, III, of the Circuit Court for Washington County.

At that trial the State presented eleven witnesses who testified as to Eanes's conduct on 18 May: three residents, three local business people, one pedestrian, one police cadet, and three police officers. All generally characterized Eanes's preaching as very or extremely loud. His conduct was more specifically described as "screaming without screeching," "shouting and screaming," "yelling and screaming at the top of his voice." Each of the first six witnesses listed above testified that they were disturbed in their homes or places of business and that it was the loudness and tone they found objectionable, not the message Eanes conveyed. One resident, unable to put her son down for his nap, testified that she and her child were forced to leave their apartment due to the noise. Another resident, in an apartment in the back of the building across the street from the Clinic, testified that her husband's sleep (he worked the night shift) was disrupted. Each of the three State's witnesses who were employed in the area testified that the volume level of Eanes's speech was so great that it interfered in some manner with their work.

Although there was some conflicting testimony, several of the witnesses agreed that Eanes could readily be heard above the traffic noise. One witness testified that Eanes was "far louder than the vehicle noises," while others testified that he "overpowered" or "overtook" the sounds from the street. It also was said that Eanes could be heard as far away as "the square," a location stated to be a block and a half from where Eanes was preaching.

Eanes, testifying in his own defense, did not, for the most part, dispute this evidence. He testified that in preaching in front of the Clinic, he raised his voice. When asked why he raised his voice, he replied:

Because I'm speaking not just to the people in that building[.] I was speaking to the general people that were in that area, the bystanders, the people driving by, the people that I knew were going to be coming in.

Based on the evidence presented, Judge Wright found Eanes "guilty of willfully disturbing the peace and tranquility of that particular neighborhood during the morning of May the 18th ... by making loud and otherwise unacceptable[,] improper under the circumstances noises."

## II.

Eanes raises several constitutional challenges to his conviction. He insists that in *Diehl v. State*, 294 Md. 466, 451 A.2d 115 (1982), *cert. denied*, 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 363 (1983), this Court definitively limited application of the statutory prohibition against "loud and unseemly noises" to speech that falls outside the protective reach of the first amendment; speech, for example, that advocates imminent, lawless action. Bereft of such a limitation, he argues, the statute is left unconstitutionally vague and overbroad. He concludes that even if § 121 is found to overcome those hurdles, it cannot, consonant with the first amendment, be enforced to limit the volume level of speech that is not artificially amplified.

The State, for its part, disputes each of these contentions. It takes the position that the provision at issue is a content-

neutral regulation of the manner of protected speech, one that is neither vague nor overbroad, and one that was properly applied in the case at bar. Noting the substantial disparity between the parties' understanding of the constitutionally permissible scope of § 121, we granted Eanes's petition for writ of certiorari, 315 Md. 223, 554 A.2d 351 (1989), in order to consider if and in what manner § 121 may be applied as a limitation on protected speech.

### III.

### A.

We begin by disagreeing with Eanes's evaluation of *Diehl*. He reads that opinion much too broadly. We dealt there not with a conviction based on objectionable loudness, but with one based on allegedly objectionable content. As we shall explain, the *Diehl* limitation on which Eanes relies is only applicable when the prohibition against "loud and unseemly noise" seeks to regulate the content of speech.

*Diehl* involved a police officer, Gavin, who stopped an automobile for a traffic violation. Diehl, a passenger, left the vehicle but was ordered by Gavin to return to the car. Diehl responded by screaming, " 'Fuck you Gavin;' 'I know my rights;' you can't tell me what to do....' " 294 Md. at 468, 451 A.2d at 116. A crowd gathered. After Diehl refused a second time to get back in the car, Gavin arrested him for " 'screaming obscenities and ... drawing a crowd.' " *Id.* at 468, 451 A.2d at 117 [ellipsis in *Diehl*].

The State sought to uphold Diehl's subsequent conviction under § 121 in part on the ground that Diehl violated the statute "by making loud and unseemly noises in refusing 'to obey Gavin's proper order.' " *Id.* at 470, 451 A.2d at 118. At no time did the State argue that the loudness of Diehl's protestations violated § 121.[3] Rather, it was the State's

---

**3.** Indeed, we determined that the decibel level of Diehl's communication was not unexpected under the circumstances. *Diehl*, 294 Md. at 471–472, 451 A.2d at 118.

position that the statements "attracted a crowd and enhanced the possibility of chaos." Appellee's Brief in *Diehl v. State* at 6; *see* 294 Md. at 480–481, 487–488, 451 A.2d at 123, 126–127 (Rodowsky, J., dissenting). Since the State's argument addressed the content of Diehl's speech (and not its loudness), we determined that in order to qualify as *"loud and unseemly noise,"* under the circumstances, "Diehl's conduct must have advocated imminent lawless action and been likely to incite a breach of the peace...." *Diehl,* 294 Md. at 472, 451 A.2d at 119 [emphasis in original]. In this manner we limited the provision's ability to regulate the content of speech. We did not in that case, however, consider the argument the State at present raises before us: that the statute serves as a constitutionally valid content-neutral regulation of the volume level of protected speech. We now address that question.

### B.

The command of the first amendment, that "Congress shall make no law ... abridging the freedom of speech ...," is directed with equal force, by way of the fourteenth amendment, to state and local governments. *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925); *see also Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 500 n. 8, 72 S.Ct. 777, 780 n. 8, 96 L.Ed. 1098, 1105 n. 8 (1952) (collecting cases); *Schowgurow v. State,* 240 Md. 121, 124, 213 A.2d 475, 478 (1965). This "constitutional right of free expression" puts "the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." *Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 1787–1788, 29 L.Ed.2d 284, 293 (1971). The "freedom to think as you will and to speak as you think" is a "means indispensable to the discovery and spread of political truth" and is essential both to "stable government" and to "political

change." *Whitney v. California,* 274 U.S. 357, 375–377, 47
S.Ct. 641, 648–649, 71 L.Ed. 1095, 1105–1106 (1927) (Brandeis, J., joined by Holmes, J., concurring), *overruled* by
*Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23
L.Ed.2d 430 (1969).[4] It has been described as "the Constitution's most majestic guarantee...." L. Tribe, *American
Constitutional Law* § 12–1 at 785 (2d ed. 1988).

Yet "the First and Fourteenth Amendments have never
been thought to give absolute protection to every individual
to speak whenever or wherever he pleases, or to use any
form of address in any circumstances that he chooses."
*Cohen,* 403 U.S. at 19, 91 S.Ct. at 1785, 29 L.Ed.2d at 290.
*See Kovacs v. Cooper,* 336 U.S. 77, 85–86, 69 S.Ct. 448, 453,
93 L.Ed. 513, 521 (1949) (sound trucks); *Chaplinsky v. New
Hampshire,* 315 U.S. 568, 571–572, 62 S.Ct. 766, 769, 86
L.Ed. 1031, 1035 (1942) ("fighting words"); *Schenck v.
United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed.
470, 473–474 (1919) (clear and present danger of imminent
unlawful conduct). "Even protected speech is not equally
permissible in all places and at all times." *Cornelius v.
NAACP Legal Defense & Educational Fund, Inc.,* 473
U.S. 788, 799, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567, 578
(1985) (nonpublic forum); *see Frisby v. Schultz,* 487 U.S.
474, ——, 108 S.Ct. 2495, 2499, 101 L.Ed.2d 420, 428 (1988)
(picketing of single residence); *Cox v. Louisiana,* 379 U.S.
536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471, 484 (1965)
(obstructing sidewalk). The fundamental importance of
free speech in our constitutional scheme requires, however,
that restrictions on its exercise be subjected to searching
scrutiny. *Frisby,* 487 U.S. at ——, 108 S.Ct. at 2499, 101
L.Ed.2d at 428.

Constitutional analysis begins by looking at the type of
forum the speaker seeks to employ. *Id.* We deal here with

---

**4.** Although *Whitney* was overruled by *Brandenburg,* the words of
Justice Brandeis remain a meaningful exposition on the singular
importance of free speech to the maintenance of our democratic
ideals.

the public streets and sidewalks which have been repeatedly recognized as "archetype[s] of ... traditional public forum[s]." *Id.* *See, e.g., Boos v. Barry,* 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333, 343 (1988); *Cornelius, supra,* 473 U.S. at 802, 105 S.Ct. at 3448–3449, 87 L.Ed.2d at 580; *Perry Education Assn v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–955, 74 L.Ed.2d 794, 804 (1983). " '[S]treets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely.' " *Hudgens v. NLRB,* 424 U.S. 507, 515, 96 S.Ct. 1029, 1034, 47 L.Ed.2d 196, 204 (1976) (quoting *Food Employees v. Logan Valley Plaza,* 391 U.S. 308, 315, 88 S.Ct. 1601, 1606, 20 L.Ed.2d 603, 610 (1968)).[5]

 ■ When a court reviews restrictions on speech in traditional public forums, "the appropriate level of scrutiny is initially tied to whether the statute distinguishes between prohibited and permitted speech on the basis of content." *Frisby,* 487 U.S. at ——, 108 S.Ct. at 2500, 101 L.Ed.2d at 429. A content-based restriction is constitutionally hale only if it can be shown that the challenged " 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end....' " *Id.* (quoting *Perry,* 460 U.S. at 45, 103 S.Ct. at 955, 74 L.Ed.2d at 804) [ellipsis in *Frisby*]. *See Sable Communications of Calif. v. FCC,* —— U.S. ——, ——, 109 S.Ct. 2829, 2837, 106 L.Ed.2d 93, 106 (1989) (content-based regulation of telephonic commercial communication); *Carey v. Brown,* 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263, 270 (1980) (content-based regulation of residential picketing). On the other hand, a state " 'may ... enforce regulations of the

---

**5.** The nature of the street in question (*i.e.,* rural, residential, commercial, or some variant thereof) is not important at this stage of analysis since "all public streets are held in the public trust and are properly considered traditional public fora." *Frisby,* 487 U.S. at ——, 108 S.Ct. at 2500, 101 L.Ed.2d at 429.

time, place and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *Frisby*, 487 U.S. at ——, 108 S.Ct. at 2500, 101 L.Ed.2d at 429 (quoting *Perry*, 460 U.S. at 45, 103 S.Ct. at 955, 74 L.Ed.2d at 804). *See Ward v. Rock Against Racism*, —— U.S. ——, ——, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661, 675 (1989) (content-neutral regulation of sound volume); *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221, 227 (1984) (content-neutral ban on overnight sleeping and camping in certain parks).

█ In this case even Eanes does not question that as applied to protected speech § 121 can be read as content neutral. Indeed, because we are working in the area of protected speech, the statutory phrase "loud and unseemly noise" should be construed in a content-neutral fashion in order to remain in conformity with first amendment jurisprudence. "[I]f one of the proposed interpretations would render an enactment valid, while another would render it invalid or ineffective, the court will construe the enactment to be valid whenever feasible." *City of College Park v. Cotter*, 309 Md. 573, 589, 525 A.2d 1059, 1067 (1987); *see Craig v. State*, 316 Md. 551, 566, 560 A.2d 1120, 1127 (1989).

In *Matter of Nawrocki*, 15 Md.App. 252, 289 A.2d 846 (1972), Judge Orth, then of the Court of Special Appeals, faced with construction of the phrase "loud and unseemly" as it appears in § 121, gave the words their common meaning.

> 'Loud' is 'characterized by high volume and intensity of sound ... clamorous and insistent.' 'Unseemly' and its synonyms such as 'improper', 'indecorous', 'indelicate' mean 'in violation of accepted standards of what is right or proper.'

*Id.* at 256, 289 A.2d at 849 [ellipsis in opinion]. "Unseemly" has also been defined as "analogous to the oft-used term

'unreasonable.'" *Heard v. Rizzo,* 281 F.Supp. 720, 741 (E.D.Pa.1968), *aff'd,* 392 U.S. 646, 88 S.Ct. 2307, 20 L.Ed.2d 1358. We interpret the word "unseemly" as directly modifying the volume level of "loud." It requires the meaning of "loud" to be informed by the circumstances. It does not act as a blanket proscription against loud speech. If the other statutory elements are met, § 121 can be enforced only if the speech is unreasonably loud under the circumstances.[6] Construed in this manner the phrase "loud and unseemly noise" is clearly content-neutral.

This content-neutral law is not a regulation of time or place. Under the statute individuals may speak in any traditional public forum at any time. The elements of time and place operate, in the context of the statute, to inform; they are not themselves the subject of regulation. As the State correctly contends, § 121 is a regulation on the manner of expression. It serves to limit, under proper circumstances, the loudness of the delivery of the communication.

As a regulation on the manner of expression, § 121 must be narrowly tailored to serve a substantial government interest. The Supreme Court recently pointed out that "it can no longer be doubted that government 'ha[s] a substantial interest in protecting its citizens from unwelcome noise.'" *Ward,* — U.S. at —, 109 S.Ct. at 2756, 105 L.Ed.2d at 678 (quoting *City Council of Los Angeles v. Taxpayer for Vincent,* 466 U.S. 789, 806, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772, 787 (1984), citing *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949)) [brackets in *Ward*]. *See also Saia v. New York,* 334 U.S. 558, 562, 68 S.Ct. 1148, 1150, 92 L.Ed. 1574, 1578 (1948); *Reeves v. McConn,* 631 F.2d 377, 382 (5th Cir.1980).

What is more

---

**6.** In a similar fashion, a federal regulation which prohibited disruption of the official duties of government employees by "'loud or unusual noise'" was held to "include speech ... only where the manner of expression is in itself unreasonable." *United States v. Occhino,* 629 F.2d 561, 563 (8th Cir.1980) (per curiam), *cert. denied,* 450 U.S. 968, 101 S.Ct. 1487, 67 L.Ed.2d 618 (1981).

[t]his interest is perhaps at its greatest when government seeks to protect " 'the well-being, tranquility and privacy of the home.' " *Frisby v. Schultz*, 487 U.S. at [——], [108 S.Ct. at 2502, 101 L.Ed.2d at 431] (quoting *Carey v. Brown*, 447 U.S. [at] 471 [100 S.Ct. at 2296, 65 L.Ed.2d at 276] (1980)), but it is by no means limited to that context, for the government may act to protect even such traditional forums as city streets and parks from excessive noise. [citations omitted]

*Ward*, —— U.S. at ——, 109 S.Ct. at 2756, 105 L.Ed.2d at 678–679. In *Ward*, the Supreme Court upheld a regulation which gave New York City broad authority to control the volume level of concerts and other performances (recognized as protected speech) at a Central Park bandshell, on the justification that the City sought "to avoid undue [noise] intrusion into residential and other areas of the park." *Id.* at ——, 109 S.Ct. at 2754, 105 L.Ed.2d at 676.

In *Kovacs, supra,* a much earlier antinoise case relied on in *Ward,* the Supreme Court upheld a city ordinance which prohibited the use of sound trucks which emitted "loud and raucous" noise. As in *Ward,* the concern in *Kovacs* was on protecting the "unwilling listener" both on the street and in the privacy of his or her home. 336 U.S. at 86–87, 69 S.Ct. at 453, 93 L.Ed. at 522. Without such regulation, the court remarked, "in the residential thoroughfares the quiet and tranquility so desirable for city dwellers would ... be at the mercy of advocates of particular religious, social or political persuasions." *Id.* at 87, 69 S.Ct. at 453, 93 L.Ed. at 522.

*Ward* and *Kovacs,* as well as numerous other Supreme Court cases, reflect judicial concern with balancing the right of free speech with the individual's right to be free from unwanted communication. *See, e.g., Frisby,* 487 U.S. at ——, 108 S.Ct. at 2502, 101 L.Ed.2d at 431; *Carey,* 447 U.S. at 470–471, 100 S.Ct. at 2295, 65 L.Ed.2d at 276; *F.C.C. v. Pacifica Foundation,* 438 U.S. 726, 748, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073, 1093 (1978); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 208–211, 95 S.Ct. 2268, 2272–2274, 45 L.Ed.2d 125, 130–132 (1975); *Lehman v. City of*

*Shaker Heights,* 418 U.S. 298, 302–303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770, 776–777 (1974); *Cohen,* 403 U.S. at 21–22, 91 S.Ct. at 1786, 29 L.Ed.2d at 291–292 (1971); *Rowan v. United States Post Office Dept.,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970). This has often been expressed in terms of the "captive audience."

The notion of "captive audience" involves the problem of the unwilling listener or viewer who cannot readily escape from the undesired communication, or whose own rights are such that he or she should not be required to do so. *See* Haiman, *Speech v. Privacy: Is There A Right Not To Be Spoken To?* 67 Nw.U.L.Rev. 153, 195–197 (1972). The pedestrian or motorist on a public street may simply walk or drive past the unwelcome speaker or detour around the picketers or demonstrators. As in *Cohen,* 403 U.S. at 21–22, 91 S.Ct. at 1786, 29 L.Ed.2d at 291–292, those who do not care to read or hear certain messages are, in these circumstances, free to turn away. But the *Cohen* Court pointed out that the people passing through a courthouse corridor, who could look the other way if they did not like the anti-draft message on the back of Cohen's jacket, "were in a quite different posture than, say, those subjected to the raucous emissions of sound trucks blaring outside their residences." 403 U.S. at 21, 91 S.Ct. at 1786, 29 L.Ed.2d at 292. Justice Harlan, writing for the Court, explained:

> [T]his Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue.... The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner.

*Id.* [citations omitted]. *See also Carey,* 447 U.S. at 471, 100 S.Ct. at 2295, 65 L.Ed.2d at 276 (1980) (preserving sanctity of the home from tribulations of daily pursuits is an important value).

Thus, while door-to-door residential canvassing cannot be subject to blanket prohibition, *Schneider v. New Jersey,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939), a householder who does not wish to be canvassed may be permitted to prevent unwelcome visits by invoking trespass laws. *Martin v. Struthers,* 319 U.S. 141, 147–148, 63 S.Ct. 862, 865–866, 87 L.Ed. 1313, 1319 (1943). Within the home, "the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder." *Pacifica Foundation,* 438 U.S. at 748, 98 S.Ct. at 3040, 57 L.Ed.2d at 1093. For even if "the First Amendment may require unwilling adults to absorb the first blow of offensive but protected speech when they are in public before they turn away, ... a different order of values obtains in the home." *Id.* at 759, 98 S.Ct. at 3045–3046, 57 L.Ed.2d at 1100 (Powell, J., concurring) [citations omitted]. *See also Frisby,* 487 U.S. at ——, 108 S.Ct. at 2503, 101 L.Ed.2d at 432 (unwilling listeners may be protected within their own houses); *Rowan v. Post Office Dept.,* 397 U.S. at 736, 90 S.Ct. at 1490, 25 L.Ed.2d at 742–743 (householder may act to preclude receipt of unwanted mail).

Moreover, a captive audience that is entitled to protection may exist outside the home. Because riders on public rapid transit vehicles are captive audiences, a municipality may decline to accept political advertising on these vehicles. *Lehman, supra. See also Grayned v. Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (ordinance prohibiting disturbance of school).

The principle is grounded on the concept of privacy. "The Supreme Court permits the state to protect listeners who are 'captive' to unwanted speech—when speech invades their privacy interest in an essentially intolerable manner." Note, *Too Close For Comfort: Protesting Outside Medical Faculties,* 101 Harv.L.Rev. 1856, 1863 (1988) [footnote omitted]. Although that protection is most often extended to those within their homes, it may be extended to any situation in which "privacy interests [are] substantially threatened" because "individuals cannot escape 'bombardment of

[their] sensibilities.' " *Id.* at 1864 (quoting *Erznoznik,* 422 U.S. at 211, 95 S.Ct. at 2273, 45 L.Ed.2d at 132, quoting *Cohen,* 403 U.S. at 21, 91 S.Ct. at 1286, 29 L.Ed.2d at 292). *See also* Comment, *'I'll Defend to the Death Your Right to Say It ... But Not to Me'—The Captive Audience Corollary to the First Amendment,* 1983 S.Ill.U.L.J. 211, 215–216.

Sound is one of the most intrusive means of communication. "The unwilling listener is not like the passer-by who may be offered a pamphlet in the street but cannot be made to take it." *Kovacs,* 336 U.S. at 86–87, 69 S.Ct. at 453, 93 L.Ed. at 522 [footnote omitted]. The cases support the view that content-neutral regulations controlling its loudness are permissible. *See, e.g., Ward,* (volume may be controlled to protect area of park and nearby residences); *Grayned,* (ordinance prohibiting disturbance of good order of a school valid); *Kovacs* (municipality may control volume of sound trucks); *Reeves* (city may protect citizens from unreasonable or disruptive levels of noise in streets). It may be otherwise outside the home or office, where the audience is ordinarily not captive, *see Pacifica Foundation,* 438 U.S. at 749 n. 27, 98 S.Ct. at 3040 n. 27, 57 L.Ed.2d at 1093 n. 27; *Erznoznik,* 422 U.S. at 209–211, 95 S.Ct. at 2272–2273, 45 L.Ed.2d at 130–132; *Cohen,* 403 U.S. at 21, 91 S.Ct. at 1786, 29 L.Ed.2d at 292. But § 121 prohibits only that volume level of communication that unreasonably disturbs individuals whose rights to be free from aural abuse override the right of a speaker to address them by direct or incidental oral communication. This is the type of balance of conflicting interests contemplated by first amendment jurisprudence.

■ We read the statute as going no further than to afford content-neutral protection to the captive auditor (on the facts before us, auditors in homes or in private offices) who cannot avoid continuing, unreasonably loud and disruptive communications emanating from the street. So read,

the statute serves a substantial interest and is narrowly tailored to serve those ends.[7]

When the State seeks to correct a particular evil by way of time, place, or manner restrictions, it need not employ the least restrictive or least intrusive means. *Ward*, —— U.S. at ——, 109 S.Ct. at 2758, 105 L.Ed.2d at 680. "Rather, the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536, 548 (1985) [ellipsis in *Ward*]. Since the character of open public places may differ widely, one from another, only a flexible approach to volume control can adequately serve the myriad circumstances which the State can legitimately regulate. As we have pointed out, it is the particular circumstances that render a loud communication unseemly or unreasonable, and hence subject to time, place, and manner regulations.

Consider apartment dwellers and workers in private offices along West Washington Street. The record in this case makes clear that during business hours the street is heavily travelled by motor vehicles, including large trucks. This traffic produces a high noise level, and one who wishes

---

**7.** We reject the argument that a statute of this nature may survive first amendment scrutiny only if it is limited to a communication that is both loud and either presents a clear and present danger of violence or is not intended as a communication but "is merely a guise to disturb persons." *See In re Brown*, 9 Cal.3d 612, 108 Cal.Rptr. 465, 469, 510 P.2d 1017, 1021 (1973), *cert. denied*, 416 U.S. 950, 94 S.Ct. 1959, 40 L.Ed.2d 300 (1974). *See also People v. Fitzgerald*, 194 Colo. 415, 420, 573 P.2d 100, 104 (1978); *State v. Marker*, 21 Or.App. 671, 678, 536 P.2d 1273, 1277 (1975). We have already held that *Diehl v. State*, 294 Md. 466, 451 A.2d 115 (1982), requires no such construction. Neither do the United States Supreme Court decisions. Our construction of § 121 is not inconsistent with decisions that hold antinoise statutes do not apply to speech protected by the first amendment. *See, e.g., Commonwealth v. Mastrangelo*, 489 Pa. 254, 414 A.2d 54, *appeal dismissed*, 449 U.S. 894, 101 S.Ct. 259, 66 L.Ed.2d 124 (1980). Cases of this type are concerned with possible regulation of content. We have already held that § 121 is content-neutral.

to communicate by voice with people in the street must make his or her voice heard over the sound of traffic. But when the volume of the speaker's voice not only reaches passersby in the street—the public forum—but also awakens adults sleeping in their homes, prevents children from taking their naps, and makes it impossible for workers to concentrate on their work, the volume's effect on the captive audience reaches a point at which that volume may be controlled.[8]

One speaking on West Washington Street at midnight, with traffic levels much reduced, could run afoul of § 121 at a lower level of voice volume. In this quieter environment, a less loud oral presentation could unreasonably disturb what might well be a larger captive audience, at least from the viewpoint of apartment dwellers. *See People v. Fitzgerald,* 194 Colo. 415, 419, 573 P.2d 100, 103 (1978) (proscribed conduct "necessarily varies according to the time, location and decibel level of such conduct"); *Commonwealth v. Orlando,* 371 Mass. 732, 735, 359 N.E.2d 310, 312 (1977) (same). And if we move the scene to an area of Hagerstown that is solely residential, still different levels of speech might suffice to violate the statute. *Reeves,* 631 F.2d at 385 n. 10 (threshold level of prohibited disruptive noise may be substantially lower in areas primarily residential). We deal with a balancing that involves the time and place where speech occurs as well as the nature of the

---

**8.** In the context of common law nuisance, this Court has stated that:
"It can scarcely be argued that any habitual noise ... which is so loud, continuous, insistent, not inherent to the character of the neighborhood, and unusual therein, that normal men, women, and children, when occupying their own homes, however distant, are so seriously incommoded that they cannot sleep, study, read, converse, or concentrate until it stops, is not an unreasonable unlawful invasion of their rights."
*Swimming Club v. Albert,* 173 Md. 641, 647, 197 A. 146, 148–149 (1938) (quoting the chancellor's decision in that case). The criteria for disturbance of the peace by noise are sometimes equated with those for nuisance. *See, e.g., State v. Holland,* 132 N.J.Super. 17, 27, 331 A.2d 626, 631 (1975); *State v. New York Central Railroad Co.,* 37 N.J.Super. 42, 49, 116 A.2d 800, 804 (1955).

places where auditors are—the street itself; stores; schools; hospitals; private offices; homes. A sound level that a pedestrian on the sidewalk could not constitutionally object to might be impermissible with respect to a patient in an intensive care ward.

Another factor that enters the balancing is that of alternative means. We shall have more to say about this topic shortly in a somewhat different context. Whether there is some other way of achieving the actor's goal is to be considered in the determination of whether a loud sound is unreasonably loud. Road construction equipment, for example, may make a great deal of noise and may seriously disturb people in homes, hospitals, schools, and offices. But broken water mains must be repaired and streets must be maintained, and it is often the case that noisy machines are the only practicable means of achieving these objectives. Thus, the sound created by that sort of activity is not necessarily unseemly or unreasonably loud. But a speaker will usually have a number of less noisy ways of presenting his or her message: speaking at lower volume; individual contact; use of placards or leaflets. So the balance of reasonableness may rest differently depending on the circumstances. *See Commonwealth v. Greene*, 410 Pa. 111, 115–116, 189 A.2d 141, 144 (1963).

■ Another weight in the balance may be the mechanical or electronic amplification of sound. It is no doubt easier to find that an antinoise law is constitutional when it deals with that sort of amplification, as did the ordinance in *Kovacs, supra. See also, e.g., Ward, Saia* and *Reeves,* all *supra.* But even though cases like *Kovacs* emphasize the sound-truck feature of the law, we reject Eanes's argument that amplification is a constitutional *sine qua non.* Eanes would have it that a speaker could stand in front of a residence at two o'clock in the morning and shout at top volume as long as he or she pleased provided a message was being conveyed. We disagree. If the State is able to prove that, under the circumstances, the human voice is so unreasonably loud as to be unreasonably intrusive on a

captive audience, that is enough. *See, e.g., Grayned, supra.* Captive auditors in their homes and places of business need not become an unwilling congregation for Eanes's street-preaching.[9]

■ Eanes suggests that only a statute which sets a specific decibel level would be constitutional. Yet even with respect to a particular public forum, such as Hagerstown's West Washington Street, a decibel level that would permit communication with passersby and not disturb residents in their homes may vary with the time of day, air temperature, air currents, and background noise present. A standard which more specifically defined acceptable decibel levels at varying times and places would be likely both underinclusive and overbroad. *See Commonwealth v. Orlando,* 371 Mass. at 735, 359 N.E.2d at 312 (addressing the statutory standard "disturbers of the peace"). *See also Mann v. Mack,* 155 Cal.App.3d 666, 674, 202 Cal.Rptr. 296, 301–302 (1984) ("A determination as to what constitutes a 'loud, unnecessary and unusual noise' requires common sense not a decibel meter").[10] Because § 121 is tailored to respond to

---

**9.** Eanes asserts that *Cohen* prohibits the regulation of speech that does not invade "substantial privacy interests in an *intolerable manner.*" Petitioner's Brief at 27–28 [emphasis supplied]. By this Eanes means, we take it, "in a manner that is physically or psychologically unbearable." The cases do not require sound to rise to ear-drum breaking level before government can regulate. It is the invasion of privacy that is intolerable, not the sound level that produces it. *See Ward v. Rock Against Racism,* —— U.S. ——, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), in which the Supreme Court upheld a regulation of sound volume without requiring that the noise be "intolerable" before regulation could be affected. In any event, *Cohen* dealt with the content of speech, not its volume. 403 U.S. at 20–22, 91 S.Ct. at 1785–1787, 29 L.Ed.2d at 291–292. What is more, the passage from *Cohen,* on which Eanes relies, addresses "[t]he ability of the government, consonant with the Constitution, *to shut off discourse....*" *Id.* at 21, 91 S.Ct. at 1786, 29 L.Ed.2d at 291 [emphasis supplied]. We are dealing here with a statute that does not "shut off discourse" but simply limits its volume.

**10.** For some problems that may arise from "regulation by decibel," *see U.S. Labor Party v. Pomerleau,* 557 F.2d 410 (4th Cir.1977). *See also*

the individual circumstances and, as it is here construed, to regulate only that conduct which on balance can appropriately be limited consistent with the first amendment, we conclude it is sufficiently narrowly tailored.

Bolstering our determination that § 121 is narrowly tailored is the fact that the statute allows for ample alternative avenues of communication. *See Vincent,* 466 U.S. at 812, 104 S.Ct. at 2132–2133, 80 L.Ed.2d at 792. *See also* J. Nowak, R. Rotunda, J. Young, *Constitutional Law* (3d, ed. 1986) § 16.47 at 971. Nothing in § 121 prevents a speaker from orally addressing passersby, or from distributing literature or carrying a sign which expresses his or her viewpoint. Nor, if the intent of the speaker is to reach area residents or merchants, is an individual prohibited by § 121 from communicating with willing recipients by telephone, postal service, or in person. That a speaker's potential aural audience may be limited by the inability to stand outside a residence or business and scream a message to the unwilling listener therein is of little consequence when there are ample alternative channels of conveying that communication which have not been shown to be inadequate. *Ward,* —— U.S. at ——, 109 S.Ct. at 2759, 105 L.Ed.2d at 682.

In summary, we hold that § 121, as we have construed it, is content neutral, narrowly tailored to serve a significant State interest, and does not inhibit the use of various alternative channels of communication. It does not violate the first amendment unless the words "loud and unseemly noise" in § 121 render the statute vague or overbroad. We next consider those concerns.

## IV.

### A.

A penal statute is vague if it violates "[t]he cardinal requirement ... that [it] 'be sufficiently explicit to

---

*Reeves v. McConn,* 631 F.2d 377, 386 (5th Cir.1980) (enforcement of decibel-based regulation is a highly complex issue).

inform those who are subject to it what conduct on their part will render them liable to its penalties.'" *Bowers v. State,* 283 Md. 115, 120, 389 A.2d 341, 345 (1978) (quoting *Connally v. General Const. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926)). In *Bowers,* we described this "as the fair notice principle [which] is grounded on the assumption that one should be free to choose between lawful and unlawful conduct." *Id.* at 121, 389 A.2d at 345. *See Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298, 33 L.Ed.2d at 227. A statute also may be void for vagueness if it lacks fixed enforcement standards or guidelines and thus "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108–109, 92 S.Ct. at 2299, 33 L.Ed.2d at 228. Both of these tests of vagueness are based on fourteenth amendment due process or fairness concerns. Tribe, *supra,* § 12–31. We first address the issue of notice.

■■■ A law is not vague simply because it requires conformity to an imprecise normative standard.

> The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.

*Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584, 590 (1972). The touchstone is whether persons of "'common intelligence'" need reasonably "'guess at its meaning.'" *Broadrick v. Oklahoma,* 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830, 837 (1973) (quoting *Connally,* 269 U.S. at 391, 46 S.Ct. at 127, 70 L.Ed. at 328).

*Bowers* involved a vagueness challenge to a then-existing child abuse statute which made it unlawful to injure a child

by "cruel or inhumane treatment." 283 Md. at 119, 389 A.2d at 344. The statute was attacked, in part, for failing to delineate, with any specificity, between legitimate corporal punishment and illegitimate child abuse. We determined that

> [a] statute is not vague when the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, if they possess a common and generally accepted meaning.

*Id.* at 125, 389 A.2d at 347. Using a variety of the sources listed above to define the phrase "cruel or inhumane," the statute was determined to be "sufficiently explicit. . . ." *Id.* at 127, 389 A.2d at 349. We explained that

> [p]arents of ordinary intelligence are made aware that they do not subject themselves to the statute by merely engaging in corporal discipline for the purpose of punishment or correction. Only when the line is crossed and physical injury is intentionally and maliciously or cruelly inflicted does criminal responsibility attach.

*Id.* at 128, 389 A.2d at 349.

Other courts have applied these principles in responding to vagueness attacks on antinoise laws. For example, in *Kovacs, supra,* the Supreme Court confronted a vagueness challenge to the not-too-dissimilar statutory phrase "loud and raucous." 336 U.S. at 79, 69 S.Ct. at 449, 93 L.Ed. at 518. Remarking that the claim deserved only passing mention, the Court stated that "[w]hile these are abstract words, they have through daily use acquired a content that conveys to any interested person a sufficiently accurate concept of what is forbidden." *Id.* at 79, 69 S.Ct. at 449–450, 93 L.Ed. at 518.

The method of analysis is further demonstrated in *Grayned, supra.* That case involved a Rockford, Illinois, ordinance that made it a crime for anyone willfully to make a noise or diversion which disturbed or tended to disturb the peace or good order of any school in session. 408 U.S. at

107–108, 92 S.Ct. at 2298, 33 L.Ed.2d at 227. The Supreme Court held the ordinance was not unconstitutionally vague. The words "tending to disturb," in a Chicago ordinance, had previously been construed by the Supreme Court of Illinois to refer only to an imminent threat of violence. *Id.* at 110–112, 92 S.Ct. at 2299–2301, 33 L.Ed.2d at 228–230. The Rockford ordinance did not define the requisite quantum of disturbance, but the United States Supreme Court found that this question was measured by the impact of the disturbance on school activity. Given the requirements of (1) willful conduct, (2) that the noise or diversion be actually incompatible with normal school activity, and (3) a demonstrated causal relationship between "noise or diversion" and disruption, the ordinance withstood constitutional scrutiny. *Id.* at 113–114, 92 S.Ct. at 2301–2302, 33 L.Ed.2d at 230–231.

 In similar fashion, we here apply normal meanings to words of common understanding and conclude that speech that is so unreasonably loud as to unreasonably intrude on the privacy of a captive audience may be punished.[11] We hold that the words "loud and unseemly," so construed, give sufficient notice of what conduct is penalized. "Unseemly" modifies "loud" and means "unreasonably loud in the circumstances." That is clear enough. The objective "reasonable" test is used in many areas of the law

---

**11.** The objective, content-neutral perspective of § 121 is quite unlike that of an ordinance recently found unconstitutionally vague in *Fratiello v. Mancuso,* 653 F.Supp. 775 (D.R.I.1987). One of the problematic provisions of the ordinance addressed in that case prohibited "'unnecessary noises or sounds ... which are physically annoying to persons....'" *Id.* at 791. The court construed the ordinance as a content-based restriction on a selected category of speech which the listener subjectively finds annoying. *Id.* It acknowledged that in limited circumstances selective restrictions on speech have been upheld, such as "'when the speaker intrudes upon the privacy of the home ... or the degree of captivity make it impractical for the unwilling viewer or auditor to avoid exposure.'" *Id.* (quoting *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125, 131 (1975)) [ellipsis in *Fratiello* ]. But, unlike the case at bar, the court found that protection of the captive auditor was neither alleged nor demonstrated as a basis for the restriction. *Id.*

as an appropriate determinant of liability and thus a guide to conduct.[12]

An exhaustive listing of words or phrases deemed not unduly vague would unduly prolong this opinion. We note a few examples in addition to those we have already discussed: *Reeves*, 631 F.2d at 386 (prohibition of sound that is "jarring" or "a nuisance" not unconstitutionally vague; words do not provide mathematical certainty, but have acquired sufficiently definite content through daily use); *State v. Johnson*, 112 Ariz. 383, 542 P.2d 808 (1975) (statute that made it a misdemeanor to "maliciously and wilfully disturb[ ] the peace or quiet of a neighborhood ... by loud or unusual noises" is valid); *Commonwealth v. Jarrett*, 359 Mass. 491, 269 N.E.2d 657 (1971) ("disturbers of the peace" not unconstitutionally vague); *State v. Smith*, 46 N.J. 510, 518, 218 A.2d 147, 151, *cert. denied*, 385 U.S. 838, 87 S.Ct. 85, 17 L.Ed.2d 71 (1966) (statute proscribing "noisy or disorderly conduct" which "disturbs or interferes with the quiet or good order" of certain places of assembly is valid; "if there is a public interest in need of protection, due process does not stand in the way merely because the

---

12. For examples primarily in the area of criminal law, *see Simmons v. State*, 313 Md. 33, 40, 542 A.2d 1258, 1261 (1988) (imperfect self-defense; subjective belief that force was necessary unreasonable under the circumstances); *State v. Crawford*, 308 Md. 683, 696, 521 A.2d 1193, 1199 (1987) (reasonable apprehension of imminent danger element of defense to unlawful possession of handgun); *Dixon v. State*, 302 Md. 447, 459, 488 A.2d 962, 967 (1985) (element of assault: any action or conduct reasonably tending to create apprehension); *Ricketts v. State*, 291 Md. 701, 709, 436 A.2d 906, 910–911 (1981) (element of common law indecent exposure: reasonable knowledge, actual or constructive, that act is open to observation by others); *Tichnell v. State*, 287 Md. 695, 718, 415 A.2d 830, 842 (1980) (claim of self-defense requires defendant have a reasonable belief of immediate or imminent death or serious bodily harm); *Jackson v. State*, 286 Md. 430, 441, 408 A.2d 711, 718 (1979) (quoting *Wharton's Criminal Law* § 68 (Anderson, 1957)) (criminal liability may arise where " 'the ultimate harm is one which a reasonable man would foresee as being reasonably related to the acts of the defendant' "); *Mangum v. Md. St. Bd. of Censors*, 273 Md. 176, 185, 328 A.2d 283, 288 (1974) ("obscenity" to be tested by average person applying contemporary community standards).

subject defies minute prescription"); *State v. Holland*, 132 N.J.Super. 17, 23, 331 A.2d 626, 629 (1975) (prohibition of "unreasonably loud and unnecessary noise" valid because "[w]hether a given noise disturbs the public peace depends upon the circumstances of the particular case, and it is impractical to spell out rigid legislative criteria"); *Commonwealth v. Weiner*, 230 Pa.Super. 245, 326 A.2d 896 (1974) ("loud" and "unseemly" not unconstitutionally vague); *Seattle v. Eze*, 111 Wash.2d 22, 759 P.2d 366 (1988) ("loud or raucous behavior" which "unreasonably disturbs others" not unconstitutionally vague).

The words "loud and unseemly noise" as used in § 121 are no more vague than the words considered in the preceding cases. As we have construed it, the phrase "loud and unseemly noise" reasonably conveys what is forbidden. Nevertheless, a speaker exercising the legitimate rights of free speech may be unaware that his or her volume has reached a prohibitive level and has become unlawfully disruptive. In order, then, to provide fair notice in a case such as this, we believe that the application of § 121 ordinarily requires prior warning by police authority, so that the speaker is made aware that further communication at the offensive volume level may subject the individual to prosecution. *See Bacheller v. State*, 3 Md.App. 626, 634–635, 240 A.2d 623, 628 (1967), *rev'd on other grounds*, 397 U.S. 564, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1968) (Art. 27, § 123, prohibiting disorderly conduct, gives reasonable notice through its language, at least when demonstrators are notified, before arrest, that they are in violation of statute); *Occhino*, 629 F.2d at 563 (conduct held to be "unreasonable" where disruptive behavior continued after individual was warned that disturbance was being created); *Weiner*, 230 Pa.Super. at 250, 326 A.2d at 898 (statute prohibiting "loud and unseemly noise" violated when Weiner continued to use loudspeaker in residential area after police had warned him that residents had been disturbed).

As to the matter of enforcement standards, we also addressed this issue in *Bowers*, wherein we concluded that a statute is not vague

> merely because it allows for the exercise of some discretion on the part of law enforcement and judicial officials. It is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement that it will be held unconstitutional under this second arm of the vagueness principle.

283 Md. at 122, 389 A.2d at 346.

Section 121, properly construed, does not invite arbitrary or discriminatory enforcement. It can be enforced to limit protected speech only to the extent the speaker's actions are willful, the volume clearly exceeds what is necessary to address passersby, and the noise is actually disruptive to the "captive" audience in the neighborhood. Moreover, we hold that police may act under this statute only upon receipt of a complaint from an affected citizen upon the basis of which the officer reasonably believes that the statute has been violated. *See Weiner, supra.* This requirement guards against oppressive action initiated solely by government opposition to unwelcome speech. Circumscribed in this manner § 121 does not permit a subjective determination of what is "loud and unseemly noise." The inquiry is limited to relatively objective criteria and does not confer "impermissible discretion" on police officers, prosecutors, judges, or juries. *Bowers*, 283 Md. at 128, 389 A.2d at 349.

### B.

We need not dwell long on Eanes's claim that § 121 is overbroad. "The crucial question ... is whether the [statute] sweeps within its prohibitions what may not be punished under the First and Fourteenth amendments." *Grayned*, 408 U.S. at 114–115, 92 S.Ct. at 2302, 33 L.Ed.2d at 231. The concern is that an overbroad statute may, by that very fact, have a chilling effect on free expression. *Taxpayers for Vincent*, 466 U.S. at 796–798, 104 S.Ct. at

2124–2125, 80 L.Ed.2d at 781–782. That is, if a statute is to be struck down as overbroad, it must appear that the statute's very existence will inhibit free expression. *Id.* at 799, 104 S.Ct. at 2125, 80 L.Ed.2d at 782. The doctrine is "strong medicine" and should be applied sparingly. *Broadrick*, 413 U.S. at 613, 93 S.Ct. at 2916, 37 L.Ed.2d at 841. It should not be invoked when a limiting construction can be placed on the statute. *Id.* Because the overbreadth doctrine involves a challenge to the facial validity of a statute, a court should not resort to it unless there is a realistic danger that the statute itself will significantly compromise recognized first amendment protection of parties not before the court. *Taxpayers for Vincent*, 466 U.S. at 801, 104 S.Ct. at 2126, 80 L.Ed.2d at 784.

▮▮ Eanes argues that § 121 is overbroad because "it delegates standardless discretionary power to local authorities to permit or deny first amendment activity" and "because its prohibition against 'unseemly' conduct can readily ban speech on the basis of its content." Petitioner's Brief at 21–22. We have already rejected these arguments at various points in this opinion and need not repeat our reasoning.

As we have concluded, § 121 is neither without applicable enforcement standards nor can it be permissibly applied when the objection to speech is solely based on its content. What is more § 121, properly applied, reaches only that conduct which can be regulated consistent with the rights of free speech and does not reach beyond. The instant case is not unlike *Boos v. Barry, supra.* There, a provision of the District of Columbia Code was attacked as overbroad. The provision penalized any congregation of three or more persons within 500 feet of a foreign embassy, if the persons failed to disperse when ordered to do so. The Supreme Court construed the law to prohibit only "congregations" directed at an embassy and to permit the police to order dispersal only when they reasonably believed that a threat to the security or peace of the embassy was present. 485 U.S. at 331, 108 S.Ct. at 1169, 99 L.Ed.2d at 350–351. As so

construed, the statute was not unconstitutionally overbroad because it was site specific and limited to groups presenting security threats. *Id.* As a consequence, it did not reach a substantial amount of constitutionally protected conduct. *Id.* It did not have the chilling effect that is the concern of overbreadth analysis. This is also true of § 121 as we have construed it. It is not overbroad.

## V.

We now consider the final issues of whether § 121 was properly applied to the specific facts of this case and whether that application was constitutional.

The record demonstrates that Judge Wright construed § 121 in a manner consistent with this opinion. In denying Eanes's motion for judgment of acquittal at the close of the State's case, Judge Wright rejected Eanes's notion that *Diehl, supra,* limited application of § 121's prohibition against "loud and unseemly noises" to speech which advocated imminent lawlessness. After reviewing the words "loud" and "unseemly," as they were defined by Judge Orth in *Nawrocki, supra,* Judge Wright concluded:

> Courts may differ. Judges will differ. Whether they are trial judges or whether they are appellate judges in the areas of speech and protection of speech. But I think that the evidence that I've heard which indicates basically that Mr. Eanes during this morning in question was extremely loud, louder than normal, ["]one of the two loudest persons I've ever heard in my life,["] [at a] volume above the traffic.... But that the entire commotion then caused sufficient complaints to bring the police and the police officer asking Mr. Eanes to lower his voice and lower therefore the intensity and not withstanding that Mr. Eanes shouted about money for drugs, etc. at a very high voice, could well lead to the conclusion that his actions on this morning were to willfully disturb the peace and tranquility of the neighborhood. Not caring about whom he did disturb whether it be those that may

have been targets of the language or those of [the] general public....

> It was not the content. The content of his language really was not that which was disturbing. It is interesting that the people ... some of the people who were disturbed ... indicated that they agreed with his purposes. And I think that there is sufficient evidence to indicate that on this occasion ... Mr. Eanes was using his right to communicate ideas to not only communicate but to willfully disturb. And I think that that kind of activity is proscribed by Section 121.

After Eanes presented his defense and closing arguments were made, Judge Wright, in his ruling from the bench, explained how the statute was to be applied.

> The statute ... talks about willful disturbance of any neighborhood by means of loud and unseemly noises. Now the loudness of Mr. Eanes' expressions ... may well be a matter of how one views it, how one hears obviously. What is loud to one person may not be loud to another....

> But the Legislature said loud. So that has to be a fact that's found. And I would find from the evidence that Mr. Eanes' method and manner of expression was on this day in May of May 18, [1988] loud.

> Now the Legislature also said and unseemly noises. And we know that the Court, the trier of fact is to give that adjective its common meaning, improper. And improper of course means under the circumstances. What is proper in one situation or under one set of circumstances may be improper in another set of circumstances.

> *Because it also means in violation of accepted standards of what is right or proper. So the noises have to be loud and in violation of accepted standards of what is right or proper. Loud and improper noises, that can mean speech. Because there has to be a balancing of one's right to express himself and other's right to be free from disruption.*

■

*Now the method here is what is being tested not the words. We do know that and there's no reason to keep on it. But it is not the content of Mr. Eanes' speech. There can be no chilling of that right to express what one believes. So it's not the content that is being judged or can be judged by any governmental agency. The manner, however, can be subject to restriction. And the statute here is a method of governmental ... restriction of the manner in which somebody expresses his views. Because it cannot be loud and unseemly. That is the manner, loud and unseemly.* [emphasis supplied]

Having found Eanes to be loud, Judge Wright went on to find specifically that Eanes actually disturbed both residents and area business people and that he was aware that his manner of communication was disruptive to the neighborhood. He then concluded that Eanes was "guilty of willfully disturbing the peace and tranquility of that particular neighborhood during the morning of May the 18th, [1988] by making loud and otherwise unacceptable improper under the circumstances noises."

■ We hold, in view of Judge Wright's exposition of § 121, that he properly construed "loud and unseemly noise" to apply only to an improper volume level of speech and not to its content. He further correctly concluded that noise that was "loud and unseemly" was noise that was unreasonably loud under the circumstances—among those circumstances being the fact that the noise produced by Eanes unreasonably disturbed members of a captive audience who were entitled to be free of that sort of disturbance. In other words, Judge Wright properly balanced Eanes's first amendment rights against a substantial public interest protected by a narrowly drawn, content-neutral regulation. Eanes was warned to lower his voice by a police officer whose action was based on complaints from members of the captive audience. Eanes chose not to comply. Under these circumstances, he was properly convicted of a violation of the statute.

JUDGMENT OF THE CIRCUIT COURT FOR WASH-
INGTON COUNTY AFFIRMED. COSTS TO BE PAID BY
PETITIONER.

ELDRIDGE, Judge, dissenting.

The First Amendment to the Constitution of the United
States sets forth "the sweeping command"[1] that govern-
ment "shall make no law ... abridging the freedom of
speech...." In this case, however, apparently for the first
time ever, a state's highest court has upheld a criminal
conviction based solely on the loudness of a single individu-
al in delivering constitutionally protected speech with an
unamplified human voice, in a permitted place and at a
permitted time. In affirming Jerry Wayne Eanes's convic-
tion under a statute which penalizes disturbing neighbor-
hoods "by loud and unseemly noises," the majority has
construed and applied that statute in a manner inconsistent
with the First Amendment. Moreover, in applying a novel
construction of the statute to Eanes, the majority has
violated his rights under the Due Process Clauses of the
Fourteenth Amendment and Article 24 of the Maryland
Declaration of Rights.

I.

The Court's opinion points out that this case arose in the
context of an anti-abortion demonstration which took place
on the public sidewalk in front of the Hagerstown Repro-
ductive Health Services Clinic on May 18, 1988. Petitioner
Eanes had, however, preached there before. On July 1,
1987, when Eanes was engaged in preaching identical to
that of May 18, 1988, Hagerstown police officers arrested
him and charged him under Maryland Code (1957, 1987
Repl.Vol.), Art. 27, § 122. That section establishes criminal
penalties for "[a]ny person ... who shall wilfully act in a
disorderly manner by making loud and unseemly noises ...

---

1. *Abrams v. United States,* 250 U.S. 616, 631, 40 S.Ct. 17, 22, 63 L.Ed.
 1173 (1919) (Holmes, J., dissenting).

on or about any public place...." On May 17, 1988, only one day prior to the activity which is the subject of this appeal, the Circuit Court for Washington County (Moylan, J.) granted Eanes's motion for judgment of acquittal. The court found that Eanes's preaching was "extremely loud, very loud, certainly above the hubbub and noise of the busy street" and that "the particular means that they [Eanes and his fellow preachers] were doing" were "disturbing to the business people who had their businesses nearby." The court held, however, that under *Diehl v. State*, 294 Md. 466, 472–473, 451 A.2d 115 (1982), *cert. denied*, 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 363 (1983), the phrase "loud and unseemly noises" could encompass communications made in a loud manner only if they presented a clear and present danger of violence, or were not intended as communications but merely as a guise to disturb other persons. The court further held that Eanes's speech was constitutionally protected under principles set forth in United States Supreme Court opinions.

The day after his acquittal, Eanes returned to the public sidewalk in front of the clinic and resumed his preaching. A police officer, after receiving a complaint, requested that Eanes lower his voice. The officer then left the scene, later explaining at trial that

> "[t]here was a confusion among my supervisors in reference to a decision handed down by Judge Moylan the previous day and we were advised by Captain Hart to leave the area until we got a ruling from the State's Attorney's office."

After receiving another complaint about the preaching in front of the clinic, the officer returned and

> "was advised that the State's Attorney stated that Moylan's decision was in reference to that case only, that if anybody was disturbing the peace and I had probable cause to make an arrest to go ahead and make an arrest."

The officer arrested Eanes and charged him under Art. 27, § 121. That section, as previously indicated, provides criminal penalties for "[a]ny person ... who shall wilfully dis-

turb any neighborhood in [any Maryland] city, town or county by loud and unseemly noises...."

On December 15, 1988, the Circuit Court for Washington County (Wright, J.) found Eanes guilty of violating § 121.

This Court affirms the conviction by adopting a new construction of § 121, and by retroactively applying that construction to Eanes's speech. Despite the language of the statute which, as pointed out by Judge Wright below, treats "loud" and "unseemly" as separate elements, the majority today reads the word "unseemly" as a modifier of "loud." The Court holds that the "unseemly loud" noise proscribed by the statute includes unamplified political speech protected by the First Amendment, even if the speech was not likely to incite a breach of the peace.[2]

Furthermore, the Court initially states that § 121 "is not a regulation of time or place. ... As the State correctly contends, § 121 is a regulation on the manner of expression. It serves to limit, under proper circumstances, the loudness of the delivery of the communication." Majority opinion, p. 449. Later, however, the Court treats the statute as regulating in part time and place, for it says that "[o]ne speaking on West Washington Street at midnight ... could run afoul of § 121 at a lower level of voice volume." *Id.* at 455.

In the context of the present case, however, the majority holds that Eanes committed a crime solely because of the volume level of his speech, and not because it was delivered at the wrong time or the wrong place. If Eanes's unamplified speech was too loud for the public sidewalk in the heart of downtown Hagerstown at 10:30 a.m. on a weekday, I cannot imagine any time in any neighborhood in this State where he could lawfully reach the same volume.

In addition to construing "loud and unseemly" to mean "unreasonably loud," the majority adds elements to the

2. But *cf., Diehl v. State,* 294 Md. 466, 472, 451 A.2d 115 (1982), *cert. denied,* 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 363 (1983).

statute which go beyond anything suggested by the statutory language, legislative history, or case law. The Court holds that "the application of § 121 ordinarily requires prior warning by police authority...." The Court also "hold[s] that police may act under this statute only upon receipt of a complaint from an affected citizen upon the basis of which the officer reasonably believes that the statute has been violated." (Majority opinion, pp. 463–464).

## II.

In my view, the First Amendment prohibits the State from punishing Eanes for speaking against abortion on a public sidewalk in Hagerstown under the circumstances of this case. The relevant clause of Art. 27, § 121, as construed by the Court today, may not be validly applied to one in Eanes's position under the Supreme Court's First Amendment decisions.

## A.

At the time of his arrest, Eanes was engaged in free speech in its "most pristine and classic form." *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963). He was standing on a public sidewalk outside the clinic on West Washington Street, a congested, one-way thoroughfare, probably the busiest street in downtown Hagerstown. It is U.S. Route 40 West. He was in a commercial area, a block and a half from the city's public square. Between 10:30 a.m. and noon, he and another man, who were part of a group of several protesters, alternately spoke "to preach the gospel of Jesus Christ" and to "speak out against abortion" with their unamplified human voices.

Eanes was expressing his opposition to abortion, one of the most controversial political and social issues today. Unlike many other cases involving protests at abortion clinics, *there is no contention in this case that Eanes attempted to block access to the clinic.* He did not trespass on clinic property, did not threaten anyone, did not incite listeners to violence, and did not use profanity, ob-

scenity or "fighting words." Moreover, there was neither a finding nor any evidence that Eanes's speech disrupted any medical procedures at the clinic.[3] Unamplified speech, on a public sidewalk in a commercial area, about a controversial political and social topic, was Eanes's only activity.

Eanes preached his anti-abortion message in the most appropriate place and at the most appropriate time. Yet today the majority has construed and applied Art. 27, § 121, in a manner that makes the delivery of the speech a crime.

In holding that Eanes, standing on a public sidewalk adjacent to a busy street, may be punished for speaking against abortion, the majority relies on testimony that "Eanes could readily be heard above the traffic noise," although the majority acknowledges that the testimony as to this was conflicting. The only meaningful exercise of the First Amendment right to free speech under the circumstances, however, is if the speaker is allowed to speak above the traffic noise. As the majority acknowledges, public streets and sidewalks have been repeatedly recognized as archetypes of traditional public forums. The government's ability to restrict expressive activity in such places "which occupy a 'special position in terms of First Amendment protection'" is " 'very limited.' " *Boos v. Barry,* 485 U.S. 312, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988), quoting *United States v. Grace,* 461 U.S. 171, 177, 180, 103 S.Ct. 1702, 1707, 1708, 75 L.Ed.2d 736 (1983). Permitting on public sidewalks only speech which cannot be heard because of the surrounding traffic noise gives little effect to this "special position in terms of First Amendment protection."

The majority opinion also relies heavily upon testimony that, allegedly because of Eanes's speech, an adult and a child in nearby apartments could not sleep and some workers nearby were "disturbed" and had difficulty concentrating on their work. It must be emphasized, however, that

---

**3.** The only testimony concerning the effect of Eanes's speech at the clinic was by the clinic administrator, who stated that she personally was disturbed and was having difficulty hearing.

Eanes's speech was not delivered in a residential neighborhood and was not delivered at a time when most people are sleeping. Of course, some people do reside in commercial and even in industrial areas, and some people do need to sleep during the day. Furthermore, some people are "disturbed" and may lose concentration because of any sound out of the ordinary. If constitutionally protected speech is limited to that not objected to by such persons, the scope of the First Amendment's free speech clause is extremely narrow.

For example, speeches by public officials at an outdoor ceremony on the grounds of the Maryland State House in Annapolis may wake up persons sleeping in apartments above stores on State Circle; the speeches might affect the concentration of workers in the stores. If so, would the continuation of the speeches at the same volume, after a complaint and warning by an Annapolis policeman, be criminal? Are demonstrations outside of the State House, when the Legislature is in session, to be suppressed by criminal prosecution if the crowd becomes noisy and causes complaints from persons trying to sleep? [4] Presumably under today's decision, if Art. 27, § 121, is to be enforced without discrimination, they would.

The First Amendment would seem to preclude reducing speakers and the listening public to speech which does not disturb daytime sleepers in a downtown commercial area. *Cf. Butler v. State of Michigan*, 352 U.S. 380, 383–384, 77 S.Ct. 524, 526, 1 L.Ed.2d 412 (1957) ("The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children. It thereby arbitrarily curtails one of those liberties of the individual ... that

---

4. *See The Sun* (Baltimore, January 16, 1990) p. 2B (reporting on a rally outside of the State House by abortion opponents, and stating (emphasis added), "But the crowd, *though noisy,* was cheerful and peaceful, and dispersed after hearing such anti-abortion speakers as Mr. [Alan L.] Keyes, former Lt. Gov. Samuel W. Bogley and state Sen. Francis X. Kelly ..."). *See also The Capital* (Annapolis, January 16, 1990) p. 1 (describing the noise at the rally).

history has attested as the indispensable condition for the maintenance and progress of a free society").

In light of the Court's application of Art. 27, § 121, to the facts of this case, I fail to see what would stop a policeman from using the statute to "quiet" a preacher who delivers a loud sermon from inside a church that lacks air conditioning and has open windows in the summer. Such preaching, or perhaps the enthusiastic singing of the congregation, could reach the same volume level that "disturbed" the residents near the clinic. I also fail to understand what would stop an elected mayor from using § 121 to "quiet" a political opponent from delivering a loud but unamplified campaign speech at the Hagerstown public square, located only a block and a half from where Eanes was preaching. Such a speech could disturb the very same "captive auditors in their homes and places of businesses" who were "an unwilling congregation for Eanes's street-preaching."

When a particular speech is unpopular or unusual, I doubt that it will be difficult to find an affected citizen to complain, ostensibly because of the sound level. *See Saia v. New York,* 334 U.S. 558, 562, 68 S.Ct. 1148, 1151, 92 L.Ed. 1574 (1948) ("Annoyance at ideas can be cloaked in annoyance at sound"). At Eanes's trial, the woman who testified that her child could not sleep because of the preaching stated: "I really can't say whether it [the traffic noise on West Washington Street] did or did not [bother her child's sleep].... I mean the traffic was something that we lived with every day." This testimony demonstrates how complaints because of sound may depend on individual sensibilities. People who live in the commercial area of downtown Hagerstown, and sleep at 10:30 a.m., may get used to the traffic noise on West Washington Street. A speech on abortion, at a sound level merely sufficient to be heard, may disrupt and draw complaints from those same people who may not be used to it, or may not like it. The First Amendment, however, protects speakers from these individual sensibilities of their fellow citizens. *Saia v. New York, supra.*

While holding that one may be criminally punished for unamplified speech on a political or social issue, if the speech disturbs others and generates complaints, the majority apparently would not apply its holding of criminality to the operators of machines and other equipment which may make greater noise and cause greater disturbance. The Court's opinion states (p. 456): "Road construction equipment, for example, may make a great deal of noise and may seriously disturb people in homes, hospitals, schools, and offices. But broken water mains must be repaired and streets must be maintained, and it is often the case that noisy machines are the only practicable means of achieving these objectives." Because, in the majority's view, one desiring to give a speech on a political or social issue has the option of refraining from speaking and using "placards or leaflets," the majority places more importance upon the maintenance of streets than upon free speech. Under the majority's application of Art. 27, § 121, apparently only those persons desiring to exercise their First Amendment right to make speeches need fear prosecution under the statute. Those engaged in other endeavors producing a high volume of sound, such as operating noisy equipment, are apparently doing something more important and thus are exempt from the criminal statute.

The majority's insensitivity to Eanes's free speech rights is also illustrated by its assertion that "[s]ound is one of the most intrusive means of communication." The majority has overlooked that sound, in the form of the spoken word, is the most basic thing protected by the First Amendment. *See Texas v. Johnson,* —— U.S. ——, 109 S.Ct. 2533, 2540, 105 L.Ed.2d 342 (1989) ("The Government generally has a freer hand in restricting expressive conduct than it has in restricting the ... spoken word"). Merely because a speaker on a public sidewalk along a busy street needs to speak loudly to be heard above the surrounding noise, or merely because he attains a high level of sound because of the fervor with which his beliefs are held, does not justify the suppression of his speech. As Professor Chafee stated over

60 years ago, repeating an earlier thought by Judge Cooley, "you cannot limit free speech to polite criticism, because the greater a grievance the more likely men are to get excited about it, and the more urgent the need of hearing what they have to say." Zechariah Chafee, *Freedom of Speech in War Time*, 32 Harv.L.Rev. 932, 961 (1919). *See* T. Cooley, *Constitutional Limitations* 613–614 (7th ed. 1903) ("The heat of the discussion will generally be in proportion to the magnitude of the evil as it appears to the party discussing it").

The First Amendment "is a declaration of national policy in favor of the public discussion of all public questions." Chafee, *supra*, at 934. Mr. Eanes's public discussion of abortion, at a permitted place and permitted time, without obstructing, trespassing, or hindering anyone, and without any sound amplification devices, was protected by the national policy embodied in the First Amendment.

## B.

The majority argues that § 121's clause relating to "loud and unseemly" noises, as construed and applied by the Court today, is valid under the Supreme Court's First Amendment cases and justifies an affirmance of Eanes's criminal conviction. I disagree. The very cases relied on in the majority opinion undermine the majority decision.

The Court emphasizes that, under its construction of § 121, the statute's regulation of speech is "content-neutral." Theoretically this may be true. Nevertheless, as previously indicated, authorizing policemen to arrest a speaker, where the speaker is simply using his unamplified voice at a permitted time and place, on the sole ground that the speech is "too loud" and therefore disturbing to others, gives complainants and police authorities a powerful weapon which can easily be misused to suppress speech because of its content and because of the identity of the speaker. More traditional or "acceptable" speeches by public officials or prominent persons will rarely, if ever, lead to arrests,

regardless of the volume level of speech. Mavericks may regularly have problems with the police.

The majority acknowledges that even "content-neutral" regulations of speech, to be valid under the First Amendment, are subject to stringent requirements. A State may "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). *See, e.g., Ward v. Rock Against Racism,* 491 U.S. ——, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989); *Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420, 429 (1988); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984), and cases there cited. The pertinent clause of § 121, as now construed and applied by this Court, is not a narrowly drawn time, place or manner regulation, tailored to serve a significant government interest, and leaving ample alternative channels of communication. Instead, it is overbroad and vague.

(1)

Initially, the majority invokes the principle that the government has an interest in protecting its citizens from unwelcome noise, and it relies on *Ward v. Rock Against Racism, supra,* 109 S.Ct. at 2756; *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949); *Saia v. New York, supra,* 334 U.S. at 562, 68 S.Ct. at 1150–1151; and *Reeves v. McConn,* 631 F.2d 377 (5th Cir.1980). These cases, however, dealt with sound amplification devices; they indicate that narrowly drawn regulation of amplified sound is permissible. The cited cases do not countenance broad regulation of unamplified speeches.

The Supreme Court has never held that the government has a legitimate interest in controlling the volume of unamplified political or social speech delivered in an appropriate

place and at an appropriate time. Indeed, the cases have suggested otherwise.

The Supreme Court first confronted the relationship between the First Amendment and amplification devices in *Saia v. New York, supra,* 334 U.S. 558, 68 S.Ct. 1148, where a local penal ordinance forbade the use of sound amplification devices without the permission of the Chief of Police. The appellant, a Jehovah's Witnesses' minister, received a permit to use sound equipment to amplify lectures on religious subjects in a public park on Sundays. After the permit expired, his request for another one was denied on the ground that complaints had been made. When he subsequently used his equipment anyway, he was arrested and convicted. The state presented witnesses at trial who, like the witnesses at Eanes's trial, testified that they were annoyed by the sound, although not by the content, of his speeches. The Supreme Court, holding the ordinance unconstitutional, stated that the ordinance prescribed no standards for the exercise of the Chief of Police's discretion, nor was it "narrowly drawn to regulate the hours or places of use of loud-speakers, or the volume of sound (the decibels) to which they must be adjusted." 334 U.S. at 560, 68 S.Ct. at 1149. Noting that loud-speakers "are today indispensable instruments of effective public speech," the Court concluded that abuses created by loud-speakers would have to be controlled by narrowly drawn statutes, saying in language quite pertinent here (334 U.S. at 562, 68 S.Ct. at 1150–1151):

"The present ordinance would be a dangerous weapon if it were allowed to get a hold on our public life. Noise can be regulated by regulating decibels. The hours and place of public discussion can be controlled. But to allow the police to bar the use of loud-speakers because their use can be abused is like barring radio receivers because they too make a noise. The police need not be given the power to deny a man the use of his radio in order to protect a neighbor against sleepless nights. The same is true here.

"Any abuses which loud-speakers create can be controlled by narrowly drawn statutes. When a city allows an official to ban them in his uncontrolled discretion, it sanctions a device for suppression of free communication of ideas. In this case a permit is denied because some persons were said to have found the sound annoying. In the next one a permit may be denied because some people find the ideas annoying. Annoyance at ideas can be cloaked in annoyance at sound. The power of censorship inherent in this type of ordinance reveals its vice."

In the instant case, even if Eanes had used a loudspeaker, it is questionable whether § 121, as construed by the majority, could be constitutionally applied to him in light of the above holding in *Saia*. Section 121, as formulated by the Court today, is no more narrowly drawn than the ordinance in *Saia*. It does not specify permitted times, places, or decibels. The only standard to guide the "police authority," who must initially give the "prior warning" under the majority's construction of the statute, is whether a complaint has been made and whether the police officer believes that the sound is unreasonably loud.[5] The majority, employing broad and vague standards which perhaps could not constitutionally be applied to amplified sound, uses such criteria to suppress unamplified speech.

One year later, in *Kovacs v. Cooper, supra,* 336 U.S. 77, 69 S.Ct. 448, the Supreme Court upheld a Trenton, New Jersey, ordinance barring sound trucks from "broadcasting in a loud and raucous manner." The appellant had used a sound truck to broadcast music and comment on a labor dispute. The opinion of three justices, announcing the judgment of the Court, pointed out that the ordinance applied only to vehicles, only to those with a sound amplifier and only to those operating on the streets. The opinion emphasized that sound trucks could still be utilized "in

---

5. The "prior warning by police authority" which the majority has engrafted on Art. 27, § 121, might be analogized to the police refusal to renew the permit in *Saia*.

places such as parks or other open spaces off the streets." 336 U.S. at 85, 69 S.Ct. at 452. The plurality opinion also indicated that absolute prohibition of sound amplification devices in the city would be "probably unconstitutional." 336 U.S. at 82, 69 S.Ct. at 451. The opinion noted that in a city like Trenton, sound trucks blaring on the streets "would be dangerous to traffic...." 336 U.S. at 87, 69 S.Ct. at 453. In concluding, the opinion specifically addressed unamplified human speech which the ordinance did not prohibit (336 U.S. at 89, 69 S.Ct. at 454, emphasis added):

> "There is no restriction upon the communication of ideas or discussion of issues *by the human voice,* by newspapers, by pamphlets, by dodgers."

In concurring, Justice Frankfurter drew the following distinction (336 U.S. at 96, 69 S.Ct. at 458, emphasis added):

> "Only a disregard of vital differences between natural speech, *even of the loudest spellbinders,* and the noise of sound trucks would give sound trucks the constitutional rights accorded to the unaided human voice."

The ordinance in *Kovacs* was more narrowly drawn than § 121 as construed by the Court today; the *Kovacs* ordinance was limited to vehicles, was limited to sound amplification devices, and permitted the sound trucks in certain places. More importantly, however, the Supreme Court clearly drew a distinction between amplified sound and the unaided human voice.

The majority relies on a recent Supreme Court sound amplification case, *Ward v. Rock Against Racism, supra,* which concerned a challenge to "use guidelines" for a bandshell in New York City's Central Park. The regulations required bandshell performers to use sound-amplification equipment and a sound technician provided by the city. Rock Against Racism had previously sponsored programs where it furnished the equipment and technician. The city asserted two justifications for its guidelines. The first was to control noise levels at bandshell events, in order to retain the character of a quiet area of Central Park and avoid

undue intrusion into nearby residential areas. The second was to ensure the quality of sound at bandshell events.

Again, the regulations in *Ward* were much more narrowly drawn and specific than Art. 27, § 121. The *Ward* regulations specifically applied to a bandshell, in a particular location, and owned by the city. Moreover, sound amplification equipment was not proscribed; it merely had to be supplied by the city. Finally, the *Ward* regulations dealt with amplified noise, not unamplified speech on political and social issues.

The majority also cites *Reeves v. McConn, supra,* 631 F.2d 377, for the proposition that a "city may protect citizens from unreasonable or disruptive levels of noise in streets." When the United States Court of Appeals for the Fifth Circuit considered a petition for rehearing, 638 F.2d 762 (5th Cir.1981), however, it recognized the distinction between unaided and amplified sound. The court faced a challenge to an ordinance that prohibited the "amplification" of "obscene" words or sounds. After accepting a construction of "obscene" that extended beyond erotic words and included "indecent" words, the court reasoned that a "sensible balance of these competing rights [speech and a right to have 'a reasonable means of avoidance'] is to protect the speaker of obscene or indecent words only when he uses the unamplified voice...." *Id.* at 764. Instead of supporting the majority's decision in the instant case, *Reeves* points the other way.

Despite the majority's refusal to draw a distinction for First Amendment purposes between amplified sound and unamplified speech, it is clear that there is a constitutionally significant difference between the two.

(2)

Many other cases, including ones relied on by the majority, demonstrate that the majority's decision cannot be squared with First Amendment principles.

Several Supreme Court cases undermine the majority's position that mere loudness, accompanied by complaints and

warnings, is sufficient to justify the suppression of unamplified political speech. In *Edwards v. South Carolina, supra,* 372 U.S. 229, 83 S.Ct. 680, the Supreme Court reversed the breach of the peace convictions of 187 student demonstrators. At noon the demonstrators walked to the South Carolina State House grounds, an area of two city blocks open to the public, to protest racial discrimination in the state. For thirty to forty-five minutes, they marched and carried placards as a crowd of 200 to 300 onlookers gathered on adjacent sidewalks. After apparently some complaints,[6] and after being warned by police authorities that they would be arrested if they did not disperse within fifteen minutes, one of the leaders delivered a "religious harangue" and the demonstrators loudly sang while stamping their feet and clapping their hands. The noise level caused by the 187 demonstrators, as described in the Supreme Court's opinion, was certainly greater than Eanes's speech. The Supreme Court stated (372 U.S. at 233, 83 S.Ct. at 682):

> "Instead of dispersing, the petitioners engaged in what the City Manager described as 'boisterous,' 'loud,' and 'flamboyant' conduct, which, as his later testimony made clear, consisted of listening to a 'religious harangue' by one of their leaders, and loudly singing 'The Star Spangled Banner' and other patriotic and religious songs, while stamping their feet and clapping their hands. After 15 minutes had passed, the police arrested the petitioners and marched them off to jail."

The Court in *Edwards,* using language fully applicable to the present case, distinguished the situation before it from a conviction under a narrowly drawn regulatory statute (372 U.S. at 236, 83 S.Ct. at 684):

> "We do not review in this case criminal convictions resulting from the evenhanded application of a precise and narrowly drawn regulatory statute evincing a legislative judgement that certain specific conduct be limited or

---

6. *See* 372 U.S. at 232 n. 6, 83 S.Ct. at 682 n. 6.

proscribed. If, for example, the petitioners had been convicted upon evidence that they had violated a law regulating traffic, or had disobeyed a law reasonably limiting the periods during which the State House grounds were open to the public, this would be a different case."

After pointing out that the First and Fourteenth Amendments do "not permit a State to make criminal the peaceful expression of unpopular views," the Court (372 U.S. at 237–238, 83 S.Ct. at 684–685) repeated its earlier language from *Terminello v. City of Chicago*, 337 U.S. 1, 4–5, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949):

" '[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech * * * is * * * protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. * * * There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.' "

Two years later, in *Cox v. State of Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), the Supreme Court reversed the convictions of a civil rights demonstration leader for, *inter alia,* disturbing the peace. Cox had led about 2,000 students in a march to the courthouse in downtown Baton Rouge, Louisiana, to protest against discrimination and the previous day's arrest of twenty-three fellow students. At the noon demonstration, the students carried signs, sang songs and pledged allegiance to the flag. The demonstrators began to cheer loudly and clap when the

twenty-three student prisoners began to sing from their cells. After Cox encouraged the group to sit-in at stores that would not serve meals to blacks, the sheriff ordered the demonstrators to break up. They refused and were dispersed by tear gas. Authorities arrested Cox the next day. The Supreme Court viewed a film of the events and concluded that the "singing and cheering do not seem to us to differ significantly from the constitutionally protected activity of the demonstrators in *Edwards*...." 379 U.S. at 548, 85 S.Ct. at 460. In answering Louisiana's contention that the convictions should be sustained because of fears expressed by some witnesses that violence would erupt, the Court again pointed to *Terminello.*

*Grayned v. Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), is relied on by the majority in the instant case to support its concern for the well being of a "captive audience," and to support its conclusion that sound "is one of the most intrusive means of communication." Yet *Grayned* demonstrates the relevance of *Edwards* and *Cox* to the facts before us today. In *Grayned,* an Illinois antinoise ordinance forbad people, while on grounds adjacent to a school building, from making noises or diversions that disturb the "peace or good order" of a school session or class. In holding that the ordinance was sufficiently narrowly tailored, and not unconstitutionally vague or overbroad, the Supreme Court emphasized that the ordinance was limited to grounds adjacent to a school building, was limited to times when school was in session, and, as construed by the Supreme Court of Illinois, was limited to prohibiting "actual or imminent interference with the 'peace or good order' of the school." 408 U.S. at 111–112, 92 S.Ct. at 2301. Even with these specific time, place and manner limitations, the *Grayned* Court at one point stated that "the question is close" as to whether the ordinance was "impermissibly vague." 408 U.S. at 109, 92 S.Ct. at 2299.

The statute under which *Eanes* was convicted, as construed by the majority today, has none of these time, place and manner limitations. Although the majority of this

Court seems to believe that the requirement of a prior police warning helps to narrow the regulation of speech, the Supreme Court in *Grayned* indicated that police discretion in determining whether conduct was proscribed contributes to rendering a statute impermissibly vague. *Ibid.*

Furthermore, in upholding the ordinance, the *Grayned* opinion drew a sharp distinction between noisy demonstrations adjacent to a school and noisy demonstrations elsewhere (408 U.S. at 120, 92 S.Ct. at 2305)

"Noisy demonstrations that disrupt or are incompatible with normal school activities are obviously within the ordinance's reach. Such expressive conduct may be constitutionally protected at other places or other times, cf. *Edwards v. South Carolina,* 372 U.S. 229 [83 S.Ct. 680, 9 L.Ed.2d 697] (1963); *Cox v. Louisiana,* 379 U.S. 536 [85 S.Ct. 453, 13 L.Ed.2d 471] (1965), but next to a school, while classes are in session, it may be prohibited. The antinoise ordinance imposes no such restriction on expressive activity before or after the school session, while the student/faculty 'audience' enters and leaves the school."

The Supreme Court clearly indicated that "noisy demonstrations that disrupt" constitute speech which enjoys constitutional protection in at least some places and some times. The majority's construction and application of Art. 27, § 121, totally ignores these words.

At Eanes's May 17, 1988, trial, Judge Moylan noted that *Edwards* "bears a resemblance to this case." He also stated that the issue in *Cox* was "not far removed from the issue or type of activity here.... There is simply the exercise by citizens of their First Amendment right." As previously indicated, the speech for which Eanes stands convicted was undoubtedly no louder than the cheering, clapping, and singing of 187 demonstrators in South Carolina whose convictions were reversed in *Edwards.* The "captive audience" in downtown Baton Rouge, Louisiana, would not have even heard Eanes amidst the singing and cheering of 2,000 demonstrators involved in *Cox.* It is difficult for me to believe that the Supreme Court would

have sustained convictions in *Edwards* and *Cox* based on broad statutes proscribing "unseemly loud" noises.

*Edwards, Cox,* and *Grayned,* read together, make it clear that authorities cannot invoke a general disorderly conduct statute like Art. 27, § 121, to suppress a speech simply because it is noisy.

## C.

A state's interest in protecting its citizens from unwelcome noise may justify some narrowly drawn time, place and manner regulations of noise. No such regulations are being applied in the case at bar.

The relevant clause of Art. 27, § 121, does not itself contain any time or place regulations. While the majority's construction of the statute and reference to the "circumstances" might embody a vague time and place component applicable in another case, *e.g.,* a speech at midnight or in a residential neighborhood, no time or place regulation is applicable in the present case. Concededly Eanes's speech was at a permitted time and a permitted place.

The majority believes that its formulation and application of the "unreasonably loud" standard, coupled with the need for a complaint and prior police warning, is a specific regulation of the "manner" of speech, and "is sufficiently narrowly tailored" to be valid under First Amendment principles. Neither reason nor case law supports this position.

The standard adopted by the majority is, on its face, a vague one. As previously discussed, it lacks the objective specificity of the regulations of sound involved in cases such as *Kovacs v. Cooper, supra; Grayned v. Rockford, supra; Ward v. Rock Against Racism, supra; Reeves v. McConn, supra;* and others. For example, the *Kovacs* standard, in addition to the limitation "loud and raucous," applied only to vehicles, only to amplified sound, and only to streets. The *Grayned* standard had express time and place limitations, coupled with a much more specific manner

limitation, namely actual or imminent interference with the operations of the school.[7] The regulation in *Ward* applied to a particular bandshell, in one specific location, and to amplified noise. No case cited by the majority, and no case of which I am aware, upholds the suppression of unamplified political speech, at a permitted time and place, under a vague "unreasonably loud" standard.[8]

Further contributing to the vagueness of Art. 27, § 121, are the different meanings which the majority ascribes to the statutory phrase "loud and unseemly." As I understand Part III A of the majority opinion, if the complaint (or perhaps the theory of the prosecution—I am not sure which) about a speech relates to its content, then the phrase "loud and unseemly" means speech advocating "imminent lawless action and ... likely to incite a breach of the peace." On the other hand, if the complaint purportedly does not concern the content of the speech, then the words "loud and unseemly" mean "the volume level of protected speech" (majority opinion, p. 445). This is a great deal of

---

**7.** *See also Portland Feminist Women's Health Center v. Advocates For Life, Inc.,* 859 F.2d 681, 684 (9th Cir.1988), where the United States Court of Appeals for the Ninth Circuit considered a constitutional challenge to a preliminary injunction against "shouting, screaming, chanting, or yelling during on-site demonstrations" outside a clinic that provided abortion services. While the court concluded that a state can regulate disruptive expression outside a clinic where medical services are offered, it affirmed the lower court only after modifying the injunction to forbid "a volume that substantially interferes with the provision of medical services within the Center...." 859 F.2d at 686–687.

 As previously noted, in the instant case there were neither findings nor any evidence that Eanes's speech interfered with medical services at the clinic, and the majority does not require this under its construction of the statute.

**8.** The majority argues that, to be valid, a regulation of noise need not specify the permitted and prohibited sound levels by decibels. I agree. Nevertheless, regulations of speech which do not specify decibels, and which have been upheld by the courts, have contained other specific time, place or manner criteria. In the absence of sufficient other criteria, a specification of decibels might help, depending upon the circumstances. *See Saia v. New York,* 334 U.S. 558, 562, 68 S.Ct. 1148, 1150, 92 L.Ed. 1574 (1948).

flexibility for three little words. How such flexibility can be deemed to constitute a "narrowly tailored" regulation of speech is beyond my comprehension.

In addition the statute, as construed by the majority, obviously suffers from overbreadth, as "its reach ... prohibits constitutionally protected conduct." *Grayned v. Rockford, supra,* 408 U.S. at 114, 92 S.Ct. at 2302. As discussed earlier, the standard employed by the majority would encompass peaceful but noisy demonstrations at the State House, like those involved in *Edwards v. South Carolina, supra,* and like those which regularly occur in Annapolis. The majority's standard would prohibit peaceful but noisy civil rights demonstrations in downtown areas, similar to those deemed constitutionally protected in *Cox v. Louisiana, supra.* The recent non-violent anti-government demonstrations in Eastern Europe, which have been generally praised in this country, would undoubtedly have constituted criminal activity if they had occurred in Maryland, under the test employed by the majority. The examples of protected First Amendment activity, potentially encompassed by the standard being applied to Eanes's speech, are endless.

In *State v. Swoboda,* 658 S.W.2d 24 (Mo.1983), the Supreme Court of Missouri held that a statute proscribing "unreasonably and knowingly causing alarm to another person or persons not physically on the same premises by ... [l]oud and abusive language" was unconstitutionally overbroad. Using language that is quite apt in the present case, the Supreme Court of Missouri emphasized that the statute "can encompass virtually any expletive unreasonably and knowingly uttered at high volume and with high intensity, so long as a complainant is alarmed; vehement political discussion obviously contemplated by the first amendment could fall within the statute's proscription." *Id.* at 25.

The complaint and police warning requirements, which the majority today engrafts upon the legislative enactment, do not transform the majority's "unseemly loud" standard

into a permissible narrowly tailored time, place or manner regulation of speech. If anything, the complaint and warning requirements may exacerbate the First Amendment problems.

Preliminarily, complaints and prior warnings by authorities have been present in many of the Supreme Court's cases dealing with regulations of activity protected by the First Amendment. The Court has not, to the best of my knowledge, given any weight to these factors in determining whether the regulation was constitutionally valid. *See, e.g., Edwards v. South Carolina, supra.*

Any time government authorities desire to suppress activity protected by the First Amendment, it will not be difficult for them to find complainants and to give prior warnings. The complaint and warning requirements add nothing to specificity. Whatever protection they might seem to provide against government overreaching is illusory.

Moreover, by making a complaint and a prior police warning statutory elements, the majority opens the door to discriminatory enforcement of Art. 27, § 121. Thus, if two speakers, at about the same time of day and in similar neighborhoods, reach the same volume, and persons complain only about one of them, a police officer can use § 121 only against the speaker who was the object of the complaints. While the complaints may be couched in terms of loudness, it is quite likely that the speech with "offensive" content will generate complaints and the speech with popular content, or by a popular speaker, will not.

Similarly, the prior police warning requirement may lead to the suppression of speech when there are policemen nearby, but if policemen do not happen to be in the area to give warnings, speech of comparable loudness, at the same times and places, will be exempt from the criminal statute. It is wholly irrational to make the violation of a criminal statute dependent upon the presence or absence of a police officer when the conduct takes place.

Furthermore, the prior warning requirement vests police officers with too much discretion to quell First Amendment protected activity. Empowering policemen to warn speakers, without any specific criteria, could lead to routine warnings having a chilling effect upon free speech. Also, provision of clear and explicit standards to guide law enforcement officers are necessary to prevent arbitrary and discriminatory enforcement. *Smith v. Goquen,* 415 U.S. 566, 572–573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974); *Grayned v. City of Rockford, supra,* 408 U.S. at 108–109, 92 S.Ct. at 2298–2299. This is particularly true when First Amendment activity is at stake. In *City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), the Court held that a statute giving a mayor unbridled discretion over whether to permit newsracks was unconstitutional on its face. The Court emphasized that standards are needed to provide "guideposts that check the licensor" and make more difficult "post hoc rationalizations" and the use of "shifting or illegitimate criteria." 108 S.Ct. at 2144.

In *City of Houston, Texas v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987), the Supreme Court held that a municipal ordinance making it unlawful to "wilfully or intentionally interrupt a city policeman ... by verbal challenge during an investigation" was unconstitutionally overbroad under the First Amendment. The Court emphasized that the ordinance "accords the police unconstitutional discretion in enforcement" for they would be free to arrest whom they chose out of a group of many who violate "plain language" of the ordinance daily. 482 U.S. at 466, 107 S.Ct. at 2512.

As pointed out below in Part III, a person planning to make a speech in a particular manner, at a specific time and place, should be able to determine in advance whether his activity will be a crime. By making the criminality of the activity dependent upon a complaint and police warning, the speaker has no way of knowing in advance whether the delivering of his speech will be a crime. The elements of

complaint and prior warning render the vague "unseemly loud" standard even vaguer.

Finally, the majority's argument that its construction and application of Art. 27, § 121, allows for ample alternative avenues of communication is unpersuasive. Cases upholding narrowly tailored regulations of activity protected by the First Amendment have not required persons to forego the most basic form of free speech and choose less direct methods. Thus, the defendant in *Kovacs v. Cooper, supra,* 336 U.S. at 89, 69 S.Ct. at 454, faced "no restriction upon the communication of ideas or discussion of issues by the human voice...." Eanes is not so fortunate. He must pursue less direct methods of communication, even though there was no finding by the trial court that he could have conveyed his message by alternative means without disturbing others. *See also City Council v. Taxpayers for Vincent,* 466 U.S. 789, 812, 104 S.Ct. 2118, 2132–2133, 80 L.Ed.2d 772 (1984), on which the majority relies, but where the Supreme Court noted that the sign control ordinance there involved "does not affect any individual's freedom to exercise the right to speak and to distribute literature in the same place where the posting of signs on public property is prohibited," and where the Court emphasized the findings of the trial court that there were ample alternative channels of communication.

Making a speech on a public sidewalk, with the unamplified human voice, is the one form of communication in which virtually all of our citizens may engage, as it does not ordinarily involve expenditures of money. Many who have a message, and wish to convey it in accordance with their First Amendment right, may not be able to afford printing literature, making signs, the postage involved in mailings, telephoning, and the other "alternative means" suggested by the majority. I flatly reject the majority's view that, because of "alternative means," suppression of an unamplified sidewalk speech on a political or social topic "is of little consequence" (majority opinion, p. 458).

### III.

Apart from the violation of Eanes's First Amendment rights, the majority's affirmance of his criminal conviction is inconsistent with basic principles of due process embodied in the Fourteenth Amendment and Art. 24 of the Maryland Declaration of Rights.

### A.

In addition to the constitutional requirement that a regulation of protected speech be "narrowly tailored," considerations of due process mandate that any criminal statute "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning." *Grayned v. City of Rockford, supra*, 408 U.S. at 108, 92 S.Ct. at 2298–2299. We require a criminal statute to be sufficiently definite "because we assume that a man is free to steer between lawful and unlawful conduct." *Ibid.*

In *Bowers v. State*, 283 Md. 115, 120, 123, 389 A.2d 341 (1978), Judge Levine for the Court stated that "[t]he cardinal requirement is that a penal statute 'be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties,'" (quoting from *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). The Court in *Bowers* also emphasized "that whenever a criminal statute may ... impact upon free speech rights, the void-for-vagueness doctrine 'demands a greater degree of specificity than in other contexts,'" (quoting from *Smith v. Goquen, supra*, 415 U.S. at 573, 94 S.Ct. at 1247). *See also In re Leroy T.*, 285 Md. 508, 510–512, 403 A.2d 1226 (1979) (holding that a statute prohibiting the possession of devices "commonly used ... for criminal use" was unconstitutionally vague).

For the reasons already set out in Part II above, the pertinent clause of Art. 27, § 121, as construed and applied by the majority today, does not inform a reasonable person

what conduct will render him criminally liable. If one contemplates giving a political speech at noon in the downtown area of a Maryland city, and realizes that to be heard over the traffic noise he will have to use more than a conversational level, I do not know how he determines whether his unaided voice will be deemed "unseemly loud" and generate complaints. The same is true of one contemplating joining a rally of persons clapping and singing outside the State House in Annapolis. Unlike the individual in downtown Trenton, New Jersey, in 1947, who knew that the use of a sound truck on the streets would violate an ordinance and that the use of his unaided voice would be permissible (*see Kovacs v. Cooper, supra*), the Marylander today has no criteria to determine whether his speech will be criminal.

The majority, recognizing that the statutory language as construed does not "provide fair notice," adds a prior police warning requirement.[9] I do not believe, however, that an unconstitutionally vague statute can be salvaged by judicially creating the mechanism of a police warning to operate on a case by case basis. *See Cearfoss v. State*, 42 Md. 403, 407 (1875) ("No man incurs a penalty unless the act which subjects him to it is clearly both within the spirit and letter of the statute. Things which do not come within the words are not to be brought within them by construction").

The mandate of due process is that a reasonable person should in advance be able to ascertain whether contemplated conduct violates a statute. It may be permissible in some circumstances for the meaning of a statute to be ascertained from prior reported cases, dictionaries, and oth-

---

9. The majority opinion, at p. 463, states:
 "Nevertheless, a speaker exercising the legitimate rights of free speech may be unaware that his or her volume has reached a prohibitive level and has become unlawfully disruptive. In order, then, to provide fair notice in a case such as this, we believe that the application of § 121 ordinarily requires prior warning by police authority, so that the speaker is made aware that further communication at the offensive volume level may subject the individual to prosecution."

er sources, along with the statutory language. *Bowers v. State, supra,* 283 Md. at 125, 389 A.2d at 347. Nevertheless, if a reasonable person cannot determine from these sources whether the contemplated activity is unlawful, the statute is invalid. At the very least, the vagueness cannot be cured by applying the warning requirement in the present case. *See Bouie v. Columbia,* 378 U.S. 347, 352–353, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964) ("where vague statutes are concerned, it has been pointed out that the vice in such an enactment cannot 'be cured in a given case by a construction in that very case placing valid limits on the statute' ").

### B.

Art. 27, § 121, as construed and applied by the Court today, violates due process in another, although related, respect. While the Ex Post Facto clauses of the federal and Maryland constitutions directly apply only to the acts of legislative bodies, a similar limitation applies to judicial action through the operation of the Due Process clauses.

The Supreme Court, in *Bouie v. Columbia, supra,* 378 U.S. at 352–354, 84 S.Ct. at 1702, explained this principle as follows:

"There can be no doubt that a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language. As the Court recognized in *Pierce v. United States,* 314 U.S. 306, 311, 62 S.Ct. 237, 239 [86 L.Ed. 226], 'judicial enlargement of a criminal act by interpretation is at war with a fundamental concept of the common law that crimes must be defined with appropriate definiteness.' "

\* \* \* \* \* \*

"Indeed, an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitu-

tion forbids. An *ex post facto* law has been defined by this Court as one 'that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action,' or 'that *aggravates a crime*, or makes it *greater* than it was, when committed.' *Calder v. Bull,* 3 Dall. 386, 390, 1 L.Ed. 648. [Footnote omitted.] If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction."

In *Bouie,* the Supreme Court of South Carolina had construed a statute prohibiting "entry upon the lands of another ... after notice from the owner or tenant prohibiting such entry" to proscribe staying upon, as well as entering upon, the land after such notice. The United States Supreme Court concluded that while the construction could be valid for the future, it could not be applied retroactively. 378 U.S. at 362, 84 S.Ct. at 1707.

The Supreme Court in *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), reversed convictions for, inter alia, transporting obscene materials in violation of a federal statute. The Court held that due process principles precluded retroactive application of new standards announced in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), for distinguishing between hard core pornography and protected First Amendment expression. The *Miller* case had "expanded criminal liability" in replacing the "utterly without redeeming social value" test with the "lacks serious literary, artistic, political, or scientific value" test. *Marks v. United States, supra,* 430 U.S. at 194, 97 S.Ct. at 994. Initially the Court in *Marks* stated (430 U.S. at 191–192, 97 S.Ct. at 992–993):

"The *Ex Post Facto* Clause is a limitation on the powers of the Legislature, ... and does not of its own force apply to the Judicial Branch of government. ... But the principle on which the Clause is based—the notion that persons have a right to fair warning of that conduct

which will give rise to criminal penalties—is fundamental to our concept of constitutional liberty.... As such, that right is protected by the Due Process Clause of the Fifth Amendment."

The Court went on to emphasize that it had "taken special care to insist on fair warning when a statute regulates expression and implicates First Amendment values." 430 U.S. at 196, 97 S.Ct. at 995. The Court also emphasized that it was dealing with "sweeping" statutory language, the reach of which "necessarily has been confined within the constitutional limits announced by this Court." 430 U.S. at 195, 97 S.Ct. at 994.

This Court affirms Eanes's conviction under a new construction of Art. 27, § 121, which goes far beyond the construction of the statute set forth in *Diehl v. State, supra*, 294 Md. 466, 451 A.2d 115, and earlier cases. In addition, today's construction concededly adds new elements to the statute. This Court's action is clearly inconsistent with the due process principle applied in *Bouie v. Columbia, supra; Marks v. United States, supra*; and many other cases.

In *Diehl v. State, supra*, a police officer named Vincent Gavin heard and saw the operator of an automobile squealing wheels on Main Street in Hancock, Maryland, at 10:25 p.m. He pulled the vehicle over in a supermarket parking lot and noted that it contained several people. When Robert Diehl got out on the passenger's side, Gavin ordered him to return to the vehicle. Gavin testified that Diehl began yelling such phrases as "Fuck you, Gavin"; "I know my rights"; and "You can't tell me what to do." After people began to gather, Gavin arrested Diehl for "screaming obscenities ... and drawing a crowd." Diehl fled from the scene. When a state trooper found him half an hour later and dragged him to a police car, Diehl began to kick and scream. The State charged Diehl, *inter alia*, with disturbing a neighborhood by "loud and unseemly noises" in violation of Art. 27, § 121. A jury convicted him of violating that statute and resisting arrest. This Court reversed the

convictions. We held, in an opinion by Judge Cole, that "Diehl's speech ... cannot qualify as a *loud and unseemly noise* under the" statute, because, "[a]s speech protected by the First Amendment, Diehl's conduct must have advocated imminent lawless action and been likely to incite a breach of the peace in order to be proscribable by the State." 294 Md. at 472, 451 A.2d at 119.

The majority today states that the *Diehl* test for "loud and unseemly noise" prohibited by the statute applies only where the conviction is based "on allegedly objectionable content," and that where the prosecution is based on "loudness," the statutory phrase means "unreasonably loud." (Majority opinion, Part III A). The majority justifies this reading of *Diehl* by arguing that loudness itself was not an issue in the *Diehl* case. The majority asserts that "[a]t no time did the State argue that the loudness of Diehl's protestations violated § 121." (*Ibid.*).

Preliminarily, I totally disagree with the Court's restrictive view of the issues in *Diehl*. Loudness was an issue in *Diehl*, and the Court there held that loudness itself was not proscribed by the statutory phrase. The *Diehl* opinion specifically referred to the appellant's argument that "mere loudness is not enough to constitute disorderly conduct," 294 Md. at 470, 451 A.2d at 118. The State in its brief in *Diehl* argued that Diehl was both loud in his volume and unseemly in enhancing the prospect of chaos.[10] The State did not argue that the content of Diehl's speech was *per se* unseemly.

Moreover, our opinion in *Diehl* clearly rejected the idea that loudness alone, regardless of content, was prohibited by § 121. In reasoning that Diehl's speech was not prohibited, we pointed out that "his words were chosen to express his outrage" and that "[e]ven the ... decibel level of this response was a communication that, although distasteful, should not have been surprising." 294 Md. at 471–472, 451

---

10. Appellee's brief in *Diehl v. State,* p. 6.

A.2d at 118. We directly held that "the statute is not intended to prevent [an outraged] citizen from loudly protesting," 294 Md. at 472, 451 A.2d 119. Moreover, in *Diehl* we quoted with approval from a California opinion which the majority today rejects,[11] saying (294 Md. at 473, 451 A.2d at 119):

"The Supreme Court of California in construing the terminology of a statute regarding 'loud and unusual noise' held in *In re Brown,* 9 Cal.3d 612, 108 Cal.Rptr. 465, 510 P.2d 1017 (1973), *cert. denied, California v. Brown,* 416 U.S. 950, 94 S.Ct. 1959, 40 L.Ed.2d 300 (1974) that

'The statute, however, cannot be interpreted consistent with the First Amendment and traditional views as making criminal all loud shouting or cheering which disturbs and is intended to disturb persons. [Footnote omitted.] When the word noise in the statute is properly construed consistent with the First Amendment and traditional views, it encompasses communications made in a loud manner only when there is *a clear and present danger of violence or when the communication is not intended as such but is merely a guise to disturb persons.* [108 Cal.Rptr. at 469, 510 P.2d at 1021.] [Emphasis supplied.]'

"The State's evidence failed to establish that Diehl's conduct, under the circumstances here, was unlawful under this first portion of § 121."

Regardless of whether the majority's decision is inconsistent with *Diehl,* it is clear that today's construction of § 121 is an entirely new one. In light of the statutory language, the *Diehl* opinion, and prior cases, neither Eanes nor anyone else could have anticipated the majority's present view of the statute. Until today, there has never been any suggestion that "unseemly" was a modifier of "loud" rather than a separate statutory element. Neither in Maryland nor elsewhere has a disorderly conduct statute worded like

---

11. Majority opinion n. 7.

§ 121 been construed or applied to prohibit protected speech simply because it is deemed "unreasonably loud." Lastly, the "statutory" elements of a complaint and prior police warning are admittedly brand new as of today.[12]

To adopt an unanticipated, unprecedented, and unwarranted construction of a criminal statute is bad enough. To apply that construction retroactively to Eanes's conduct is a denial of due process.

In my view, Eanes was entitled to deliver an unamplified speech on the topic of abortion, from a public sidewalk in downtown Hagerstown, during the late morning. To punish as criminal the making of the speech, purportedly because it was too loud, distorts both the statute and our basic constitutional guarantees. Finally, today's holding represents great potential danger for Marylanders speaking on controversial topics.

Judges COLE and BLACKWELL have authorized me to state that they concur with the views expressed herein.

---

**12.** After adding the prior warning requirement to the statute the majority holds that the requirement was met in the present case by the warning that Eanes received from the police officer. Until a policeman's warning was given statutory status by today's opinion, however, a reasonable person in Eanes's position would have put more reliance on the circuit court's decision the day before, acquitting him, than upon a policeman's warning. The "warning" of an officer, from a police force that had arrested him once before, could not have outweighed the security of a circuit court verdict that the statutory language and Constitution would not allow a conviction.